**J.S. SWEET CO., INC., Appellant–Plaintiff,**

v.

**WHITE COUNTY BRIDGE COMMISSION, Appellee–Defendant.**

**No. 65A01–9712–CV–416.**

Court of Appeals of Indiana.

June 29, 1999.

---

Julia Blackwell Gelinas, Terrence L. Brookie, Locke Reynolds Boyd & Weisell, Indianapolis, Indiana, Attorneys for Appellant.

K. Richard Hawley, Hawley Hudson & Hawley, Mt. Vernon, Indiana, Attorney for Appellee.

## OPINION

SHARPNACK, Chief Judge

J. S. Sweet Co., Inc. ("Sweet") appeals the trial court's judgment in its contract action against the White County Bridge Commission ("Commission"). Sweet raises four issues which we restate as follows:

1) whether the trial court erroneously concluded that a bridge operated by the Commission was public property thereby precluding the perfection of a mechanic's lien filed by Sweet;

2) whether the trial court erroneously denied Sweet prejudgment interest on its judgment against the Commission;

3) whether the trial court erroneously determined that, under the contract, Sweet was not entitled to recover compensation for excess milling; and

4) whether the trial court erroneously determined that, under the contract, Sweet was not entitled to recover compensation for excess overlay material applied to the bridge surface.

On cross-appeal, the Commission raises two issues which we restate as:

1) whether the trial court erroneously employed Sweet's measurements rather than those offered by the Commission in calculating the payment due to Sweet for patching; and

2) whether the trial court erroneously failed to find that Sweet breached the contract in regards to the minimum thickness of epoxy overlay material to be applied.

We affirm in part, reverse in part, and remand with instructions.

The relevant facts follow. In 1994, Sweet submitted a bid proposal to the Commission for repair work on the New Harmony Toll Bridge in New Harmony, Indiana. Sweet's bid was accepted and Sweet entered into a contract with the Commission whereby Sweet was to furnish the labor, materials, equipment and supervision to perform repair work on the bridge. The contract called for Sweet to remove the top one quarter inch of concrete and any bad concrete found on the deck. Sweet was then to patch any resulting holes and place an epoxy overlay system back on the deck to protect the deck and provide a wearing surface.

In 1995, following a dispute with the Commission over payment for work completed, Sweet filed a mechanic's lien against the bridge. Sweet then filed a complaint against

the Commission seeking foreclosure of the lien alleging unjust enrichment and breach of contract. The Commission responded with a counterclaim against Sweet for breach of contract. The Commission filed a motion for partial summary judgment with respect to the mechanic's lien asserting that Sweet was not entitled to a lien on the bridge because it is public property. The trial court granted the motion. Following a trial on the remaining claims, the trial court awarded Sweet $78,868.64.

## I.

■■■ The first issue raised is whether the trial court erroneously granted the Commission's motion for summary judgment on the issue of whether Sweet is precluded from perfecting a mechanic's lien against the bridge. Summary judgment is appropriate when the evidentiary matter designated to the trial court shows both that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Aide v. Chrysler Financial Corp.*, 699 N.E.2d 1177, 1180 (Ind.Ct.App. 1998), *trans. denied.* Summary judgment will be affirmed on appeal if it is sustainable on any theory or basis found in the evidentiary matter designated to the trial court. *Id.* Because the parties do not dispute the relevant facts in this case, we will decide this matter as a question of law. *Id.* Where there are no disputed facts and the question presented is a pure question of law, we review the matter de novo. *Id.*

■■■ Sweet asserts that the bridge is private property and, therefore, subject to a mechanic's lien. *See* Ind.Code § 32–8–3–1.[1] The Commission responds that because the Commission was established by federal statute for the purposes of building and maintaining the bridge, the bridge constitutes a federal public work, thereby precluding the perfection of a lien.[2] *See* Pub.L. 37, Ch. 71, 55 Stat. 140 (1941).

---

1. This statute provides for a lien on a " ... house, mill, manufactory or other building, *bridge*, reservoir, system of waterworks or other structure, sidewalk, walk, stile, well, drain, drainage ditch, sewer or cistern or earth...." I.C. § 32–8–3–1 (emphasis added).

2. The Commission concedes that the bridge is not a state public work. Appellee's brief pp. 8, 9. We agree. Indiana Code § 36–1–12–2 defines public work as follows:

"As used in this chapter, 'public work' means the construction, reconstruction, alteration, or

■ The supreme court has explained the purpose of a mechanic's lien as follows:

"The mechanics' lien laws of America, in general, reveal the underlying motive of justice and equity in dedicating, primarily, buildings and the land on which they are erected, to the payment of the labor and materials incorporated, and which have given to them an increased value. The purpose is to promote justice and honesty, and to prevent the inequity of an owner enjoying the fruits of the labor and materials furnished by others, without recompense...."

*Moore–Mansfield Construction Company v. Indianapolis, Newcastle and Toledo Railway Company*, 179 Ind. 356, 372, 101 N.E. 296, 302 (1913). Mechanic's liens have not been permitted to attach to public property held for public use. *City of Evansville v. Verplank Concrete & Supply, Inc.*, 400 N.E.2d 812, 816 (Ind.Ct.App.1980). " '(P)ublic policy and public necessity alike forbid the acquisition or enforcement of such a lien.' It requires very little imagination to realize how disruptive the attachment and attempted foreclosure of such liens might be to the orderly operation of state and local government." *Id.* (quoting *Repp & Mundt, Inc. v. Hitzelberger Supply Co., Inc.*, 170 Ind.App. 539, 540–541, 353 N.E.2d 547, 548 (1976)). State law liens may not be asserted against federally owned lands or buildings. *U.S. ex rel. Mississippi Road Supply Co. v. H.R. Morgan*, 542 F.2d 262, 265 (5th Cir.1976), *cert. denied*, 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977), *overruled on other grounds* 554 F.2d 164, 166 (5th Cir.1977). Therefore, the question we must address is whether the bridge is a federal public work,

thereby precluding the attachment of a state mechanic's lien.

In arguing that the bridge is either private or public property, the parties discuss characteristics of both the bridge and the Commission that support their respective positions. For example, in support of its conclusion that the bridge is public property, the Commission asserts that it is an agency created by federal statute, is exempt from federal and state income taxes, and that the Commission has the power of eminent domain. On the other hand, Sweet asserts that the bridge is private property because the Commission pays property taxes, the bridge is financially supported solely by tolls, receives no federal or state tax money,[3] and the Commission, not any government entity, holds title to the bridge. Having carefully weighed each of these relevant characteristics, we conclude that the bridge does not fall neatly into either the public or the private category. Therefore, we turn to case law that has specifically defined "federal public work" in the context of disputes between contractors and the federal government.

The Miller Act, 40 U.S.C. § 270, was passed to protect subcontractors and materialmen working on federal projects because normal state lien rights are not available to them. *U.S. for use of General Electric Supply Co.*, 11 F.3d 577, 580 (6th Cir.1993). However, the protection of this statute is only afforded to those working on a "public building or public work of the United States." 40 U.S.C. § 270a(a). Although the statute itself does not define "public work," a definition has been developed by courts in determining the applicability of the Miller Act to a variety of scenarios.

renovation of a public building, airport facility, or other structure that is *paid for out of a public fund or out of a special assessment.* The term includes the construction, alteration, or repair of a highway, street, alley, bridge, sewer, drain, or other improvement that is *paid for out of a public fund or out of a special assessment.* The term also includes any public work leased by a political subdivision under a lease containing an option to purchase." (emphasis added). As there is no dispute that the bridge is not owned by Indiana or supported in any way by money received from the State of

Indiana, it does not qualify as a state public work.

3. In *Borah v. White County Bridge Comm'n*, the Seventh Circuit held that a taxpayer had no right to access the records of the Commission because the Commission receives no tax money but rather operates solely on revenues generated by the service it provides. In so holding, the court stated that "[i]n such a case the corporation is treated exactly like a private corporation...." *Borah v. the White County Bridge Comm'n*, 199 F.2d 213, 215 (7th Cir.1952).

In *U.S. for use of General Electric Supply Co.*, the Sixth Circuit held that a federal district court had no jurisdiction under the Miller Act because the suit did not involve a federal public work. *General Electric*, 11 F.3d at 583. The work in dispute was a city waste water treatment plant funded by a loan from the United Sates through the Farmers Home Administration. The court concluded that the mere fact that the U.S. government was a funding source for the project did not make the plant a federal "public work." *Id.* Furthermore, the court noted that the U.S. government did not own the property, was not the intended owner of the property, and was not a party to the construction contract. *Id.; see also U.S., for use of Motta v. Able Bituminous Contractors, Inc.*, 640 F.Supp. 69, 71 (D.Mass.1986) (holding that application of the Miller Act required, at a minimum, that the U.S. be a contracting party and that a bond be issued in its favor); *U.S. ex rel Miller v. Mattingly Bridge Co.*, 344 F.Supp. 459, 462 (W.D.Ky 1972) (holding that the Miller Act did not apply to the construction of an interstate highway where the U.S. was not a party to the contract and there was no bond issued in favor of the U.S.); *Mississippi Road Supply*, 542 F.2d at 265 (extending the Miller Act's applicability to situations where the U.S. obtains ownership after construction is complete). Here, the federal government did not own the bridge, was not a party to the contract with Sweet, nor have any federal funds been appropriated to the building or maintenance of the bridge.[4] Therefore, we conclude that the bridge does not, under any definition established by case law, qualify as a federal public work. Therefore, as we find that the bridge does not qualify as either a state or federal public work, the public work prohibition against liens on public works does not apply to the bridge.

We also find further support for our conclusion in the act which created the Commission. The act authorizes the Commission to secure payment for the bridge through both the issuance of bonds and by a mortgage. Pub.L. 37, Ch. 71, § 4, 55 Stat. 140 (1941). As the statute specifically provided that the bridge may be subjected to a lien by a mortgage to secure financing for the bridge, we see no reason why a contractor cannot seek a lien on the bridge to secure payment for its services in repairing the bridge.

As we conclude that the bridge constitutes neither a state or federal public work subject to the respective statutory protections provided to those working on public projects, we hold that Sweet must be afforded the protection of a state mechanic's lien pursuant to I.C. § 32–8–3–1. Consequently, we reverse the trial court's grant of summary judgment finding that the bridge was not subject to such a lien and remand for a hearing on the validity of the lien and on the amount of attorneys fees to which Sweet is entitled pursuant to I.C. § 32–8–3–14.

## II.

The remaining issues in this case involve challenges to various findings and conclusions made sua sponte by the trial court. However, even though the specific findings were entered sua sponte, they will not be set aside unless they are clearly erroneous, just as though a party had requested the findings pursuant to Ind. Trial Rule 52(A). *Darlage v. Drummond*, 576 N.E.2d 1303, 1307 (Ind.Ct.App.1991). The specific findings control only as to the issues they cover, while a general judgment standard applies to any issue upon which the court has not made findings. *Nelson v. Gurley*, 673 N.E.2d 497, 500 (Ind.Ct.App.1996). The judgment will be reversed only when clearly erroneous, i.e., when the judgment is unsupported by the findings of fact and conclusions entered on the findings. *Id.* at 499. Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* at 499–500. To determine whether the findings or judgment are clearly erroneous,

---

4. The parties have stipulated that the sole source of revenue for the Commission is tolls paid by traffic for use of the bridge. Record, p. 291. Although the Commission directs us to a federal act authorizing federal funds to be expended for bank stabilization at the site of the bridge, we agree with Sweet that this provision does not indicate that such funds were expended directly on the bridge itself.

we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility. *Id.*

■■■■ The first of the remaining issues is whether the trial court erred in denying Sweet prejudgment interest on its judgment against the Commission. An award of prejudgment interest in a contract case in Indiana is warranted if the terms of the contract make the claim ascertainable and the amount of the claim rests upon mere computation. *Sand Creek Country Club, Ltd. v. CSO Architects, Inc.*, 582 N.E.2d 872, 876 (Ind.Ct.App.1991); *see also Lystarczyk v. Smits*, 435 N.E.2d 1011, 1015 (Ind.Ct.App. 1982) ("[p]rejudgment interest is proper when the damages are ascertainable in accordance with fixed rules of evidence and accepted standards of valuation at the time the

damages accrued."). Thus, the award is proper where the trier of fact need not exercise its judgment to assess the amount of damages. *See Sand Creek,* 582 N.E.2d at 876. An award of prejudgment interest is generally not considered a matter of discretion. *Id.; see also Erie–Haven v. Tippmann Refrigeration Const.,* 486 N.E.2d 646, 649 (Ind.Ct.App.1985).

Here, Sweet asserts that it is entitled to prejudgment interest on its judgment against the Commission for $78,868.64. The Commission asserts that the trial court properly denied Sweet prejudgment interest because the amount of Sweet's claim was unascertainable and required the trial court to determine the value of the liability. We disagree.

The trial court stated in its order that Sweet was entitled to $78,868.64 as represented by the following items:

| | |
|---|---|
| Bridge Deck Patching, Full Depth | $14,456.16 |
| Bridge Deck Overlay, One Half | $23,843.50 |
| Additional Flagging | $16,617.13 |
| Toll Booth Repairs | $ 250.00 |
| Retainage | $25,651.79 |
| Total | $78,868.64 |

Record, p. 799. We must determine whether each of these items was ascertainable at the time the claim accrued, and thereby subject to prejudgment interest, or whether the trial court was required to exercise judgment in assessing the amount due. *See Sand Creek,* 582 N.E.2d at 876. Our review of the trial court's order reveals that with respect to the items of bridge deck overlay, additional flagging, toll booth repairs, and retainage, the trial court found either that the items were uncontested by the parties or made a mere determination that the amounts were recoverable under the contract. As the trial court was not required to make an evaluation of the amount due for these items, Sweet was entitled to prejudgment interest with respect to those amounts.

■■■ However, with respect to bridge deck patching, the trial court found that "Sweet's calculations of removal and patching, full and partial, to be more probably correct than [the Commission's]." Record, p. 429. As the amount owed by the Commission had to be determined by the trial court, prejudgment interest with respect to this amount is not appropriate. *See Sand Creek,* 582 N.E.2d at 876. Therefore, we reverse the trial court's denial of prejudgment interest with respect to each of the items with the exception of the bridge deck patching. Consequently, we remand to the trial court with instructions to calculate and award prejudgment interest consistent with this opinion.[5]

5. In addition to presenting the question of whether the trial court erred in denying an award of prejudgment interest, the parties also present the question of the appropriate period for which such interest should be awarded. Prejudgment interest is computed from the time the principal amount was demanded or due and is allowable at the permissible statutory rate when no contractual provision specifies the interest rate. *See Sand Creek,* 582 N.E.2d at 876. However, it is unclear from the record when payment was demanded and due for each of the relevant items. As such, we leave this to be decided by the trial court when calculating prejudgment interest upon remand.

### III.

■ Sweet next asserts that the trial court erroneously determined that Sweet was not entitled to recover compensation for milling performed in excess of the ¼ inch specified in the contract. Sweet asserts that the evidence indicated that greater than ¼ inch of material was milled from the road surface by the sub-contractor and, therefore, it was entitled under the contract to payment for the excess milling.

With respect to Sweet's claim for the excess milling, the trial court found as follows:

"The Contract provided for payment for removal of ¼ inch of material by milling. Sweet sub-contracted this item. The sub-contractor only billed Sweet for ¼ inch of milling and Commission paid for ¼ inch. Sweet has no damages for excess milling. Sweet's claim for $50,146.25 for excess milling is denied."

Record, p. 428.

Sweet asserts that Indiana Department of Transportation Standard Specifications (1993) were incorporated into the contract and they require that a contractor be paid for removal of additional material beyond the ¼ inch depth. We disagree.

The relevant provision of the INDOT standard specifications states as follows:

"Basis of Payment. Surface removal of the initial ¼ of an inch (6.3 mm) depth will be paid for at the contract unit price per square yard (meter) for surface milling. Additional surface removal below the ¼ of an inch (6.3 mm) depth will be paid for at the contract unit price per square yard (meter) for surface milling for the required ¼ of an inch (6.3 mm) depths."

Record, p. 461, Ex. 4, p. 428. We do not interpret this provision to govern what a party to the contract must pay for, but rather the method for calculating payment for additional surface removal when already specified by the contract. To adopt Sweet's interpretation would mean that a contractor could always make a claim for additional milling done regardless of whether the contract specified the additional work to be done. Therefore, we conclude that this provision of the INDOT specifications does not require the Commission to pay for additional milling. Consequently, we must determine whether additional milling beyond ¼ inch was provided for in some other provision of the contract.

The "Scope of Work" section of the contract calls for "[s]carifying the old concrete deck (¼ inch deep) after the removal of the old deck topping." Record, p. 455, Ex. 1, p. 18. Sweet does not direct us to, nor do we find, any provision that would specifically authorize Sweet to remove in excess of ¼ inch. However, we do find a general provision regarding the procedure required to authorize any additional work. This provision provides as follows:

"Extra work agreement: Any material to be furnished or work necessary to be completed in addition to or other than specified in this document, shall be covered by a supplemental written agreement, and no claim will be covered by the Contractor for any such work performed or material furnished before such supplemental agreement has been duly made and approved and executed by the Commission"

Record, p. 455, Ex. 1, p. 5. Therefore, for Sweet to have a claim for milling in excess of the ¼ inch specified in the contract, there must be a supplemental agreement approved and executed by the Commission. As Sweet fails to direct us to any such supplemental agreement, we conclude that Sweet has failed to support its argument that it is due payment for excess milling under the contract. Consequently, we affirm the trial court's denial of Sweet's claim for $50,146.25.

### IV.

■ Sweet's final contention is that the trial court erroneously determined that Sweet was not entitled to recover compensation for excess overlay material ("SIKA") applied to the bridge surface. The trial court made the following finding with respect to this contention:

"The Contract called for a different overlay product than the SIKA product applied as agreed by Daniel Sweet for Sweet and Michael Magner for Commission.

Sweet suggested this change.

Steven Sweet had dealt in and with SIKA and was familiar with its properties.

Steven Sweet testified SIKA should be kept at between 60–70 degrees Fahrenheit but Sweet stored the SIKA overlay material in an unheated trailer so that its consistency was like molasses.

This resulted in more overlay being used than necessary.

Sweet suggested SIKA; Sweet was familiar with SIKA's requirements; and Sweet applied the SIKA.

Sweet is not entitled to be paid for the excess SIKA overlay put down.

Sweet's claim for $14,744.89 for excess overlay is denied."

Record, pp. 428–429. Sweet contends that the application of excess material was due to, *inter alia,* the cold weather, surface irregularities requiring application of additional material, and the application of additional material to expansion joints at the request of the Commission's engineer. However, the trial court's finding on this issue controls unless clearly erroneous. *See Darlage,* 576 N.E.2d at 1307. Therefore, we must determine if the evidence supports the trial court's finding that excess material was used because Sweet improperly stored the product. *See Nelson,* 673 N.E.2d at 500.

Our review of the record reveals testimony by Steven Sweet, one of Sweet's employees familiar with the SIKA overlay system, that the SIKA epoxy overlay should be kept in a heated environment, preferably at a temperature of 60 to 70 degrees Fahrenheit. He also testified that at colder temperatures the material would "thicken up" and cause problems with application. Record, p. 994. He further testified that, on this project, the barrels of epoxy were stored in an uninsulated trailer that was heated "most of the time" to above 50 degrees but that such storage did not prevent the material from becoming thick. Finally, when asked how the cold temperature affected the epoxy's coverage, he stated that the "[m]aterial was like molasses." Record, p. 1005. In addition to the above testimony, Daniel Sweet, another employee of Sweet, testified as follows:

"Q. Did the ... running over in excess of the theoretical quantity have any-

thing to do with the fact that it was cold?

A. Yes, it did.

Q. And, uh, this stuff became thick, I guess you would say?

A. Yes, it did."

Record, p. 904.

This testimony supports the trial court's finding that the excess material used was due to the fact that it was stored at less than optimal temperatures. As a result, we conclude that the trial court's finding was not clearly erroneous. *See Darlage,* 576 N.E.2d at 1307. Consequently, we affirm the trial court's denial of Sweet's claim for $14,744.89 for excess overlay.

V.

■ We next address the first of two issues raised by the Commission on cross-appeal. The Commission asserts that the trial court erroneously employed Sweet's measurements rather than those offered by the Commission in calculating the payment due to Sweet for patching. With respect to this issue, the trial court found "Sweet's calculations of [concrete] removal and patching, full and partial, to be more probably correct than Mr. Magner's." Record, p. 429. The Commission contends that the trial court was bound by Magner's calculations based upon the following contract provision:

"Authority and Duties of the Engineer:

All work shall be performed to the satisfaction of the Engineer and to prevent all disputes and litigation, the Engineer shall determine all questions in relation to the said work and the construction thereof, subject to review by the Commission."

Record, p. 54. In other words, the Commission is asserting that this provision prevents Sweet from obtaining judicial review of the Commission's calculation of the amount of patching work completed by Sweet. We disagree.

■ Regardless of whether the contract provides that the engineer will be the sole arbiter of disputes regarding the project, it is established law that the estimates made by

the engineer are not conclusive. *Baltimore & O. & C.R. Co. v. Scholes,* 14 Ind.App. 524, 528, 43 N.E. 156, 158 (1896). They are only prima facie correct and may be attacked either for fraud, mistake, or gross negligence that implies bad faith or a failure to exercise honest judgment. *McCoy v. Able,* 131 Ind. 417, 423, 30 N.E. 528, 530 (1892), *reh'g denied; Lake Michigan Water Co. v. U.S. Fidelity & Guaranty Co.,* 70 Ind.App. 537, 541, 123 N.E. 703, 705 (1919).

The Commission asserts that the evidence indicated that Magner made his measurements in good faith and that he harbored no animosity towards Sweet. However, Sweet directs us to evidence that Magner made his measurements for calculating the final quantities for patching prior to the completion of the construction activities that would determine the amount of patching that would be done. We conclude that such evidence reasonably supports a conclusion that the premature timing of Magner's measurements constitute mistake, gross negligence, or failure to exercise honest judgment. *See McCoy,* 131 Ind. at 423, 30 N.E. at 529; *Lake Michigan Water Co.,* 70 Ind.App. at 537, 123 N.E. at 705. As we find evidence to support the trial court's findings, addressing the Commission's challenge any further would require us to reweigh the evidence, which we cannot do. *See Nelson,* 673 N.E.2d at 499–500. Therefore, we conclude that the trial court's choice of Sweet's calculations with respect to patching rather than the Commission's was not clearly erroneous. *See id.*

### VI.

■ The second issued raised by the Commission on cross-appeal is whether the trial court erroneously failed to find that Sweet had failed to comply with the contract specification regarding the thickness of epoxy overlay material to be applied to the surface of the bridge. The Commission alleges that Sweet failed to apply a $\frac{3}{16}$ inch thick coating of epoxy as specified by the contract. The trial court did find that "there was a significant difference between the $\frac{3}{16}$ inch depth in overlay called for by the Contract and what was actually applied by Sweet." Record, p. 430. However, the trial court also found that the Commission's engineer had approved the material and the method of application of the overlay and that "Don Taylor, an expert witness called by Commission, could not testify that any additional overlay work was needed on the Bridge." Record, p. 431. In other words, the trial court concluded that even though Sweet may have applied a coat of epoxy less than required by the contract, the application had been approved by the Commission's engineer and, more importantly, that the Commission had failed to show, through the testimony of its own expert, that it had suffered any damages as a result of any inadequate coating.

■ The elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Fowler v. Campbell,* 612 N.E.2d 596, 600 (Ind.Ct.App.1993). The Commission does not assert that the trial court's finding with respect to the lack of damages is erroneous. As a matter of fact, the Commission failed to even include the testimony of Don Taylor in the record for our review. As a result, we affirm the trial court's denial of the Commission's breach of contract claim with respect to the thickness of the overlay applied.

In sum, we reverse the trial court's finding that the bridge was not subject to a mechanic's lien and the trial court's denial of prejudgment interest and remand for proceedings accordingly. We affirm the trial court's judgment in all other respects.

Affirmed in part, reversed in part, and remanded with instructions.

NAJAM, J., and BAILEY, J., concur.