# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-2871

J.S. SWEET COMPANY, INCORPORATED,

*Plaintiff-Appellant,*

v.

SIKA CHEMICAL CORPORATION, also
known as SIKA CORPORATION,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 99 C 168—**Richard L. Young**, *Judge.*

———————

ARGUED JANUARY 12, 2005—DECIDED MARCH 16, 2005

———————

Before FLAUM, *Chief Judge*, and EASTERBROOK and WOOD,
*Circuit Judges.*

FLAUM, *Chief Judge.* J.S. Sweet Company, Inc. ("J.S.
Sweet") brought this diversity suit against Sika Chemical
Corp. ("Sika"), alleging that defendant committed the tort
of spoliation of evidence by failing to preserve materials rel-
evant to a lawsuit between J.S. Sweet and one of its cus-
tomers. Plaintiff also sued for breach of contract. The
district court granted summary judgment on both counts,
and Sweet appealed. We hold that Sika had no duty to

preserve the evidence in question, that its loss of the evidence did not, as a matter of law, harm J.S. Sweet, and that Sika did not breach its contract with plaintiff. Accordingly, we affirm.

## I. Background

In late 1994, the White County Bridge Commission ("WCBC" or "Commission") requested bids for repair work to the surface of the New Harmony Toll Bridge. WCBC named the engineering firm of R.W. Armstrong, Inc. ("Armstrong") to review bids, help select a winner, and oversee the construction work. J.S. Sweet is a general contractor incorporated in Indiana. It bid on and won the contract, which called for it to remove the top one-quarter inch of concrete from the surface of the bridge, extract any faulty concrete, fill the resulting holes, and seal the entire surface of the bridge with an epoxy overlay. The epoxy would protect the underlying concrete and act as a wearing surface.

Sika is a chemical manufacturing company based in New Jersey which produces an epoxy designed for use in construction projects. J.S. Sweet purchased over $100,000 worth of Sika's product from a third-party distributor and applied the epoxy as the overlay on the New Harmony bridge. In early 1995, however, the epoxy began to delaminate, or peel away, from the surface of the bridge.

In May 1995, Fraser MacPhee, then a salesman for Sika, drove to New Harmony to observe this phenomenon. He was accompanied by Michael Magner, the project manager for Armstrong. Both MacPhee and Magner took photographs of the bridge. MacPhee also may have picked up some loose pieces of epoxy from the bridge's surface, but did not keep the fragments or send them to anyone else for analysis. He did not conduct any tests or use any special equipment to examine the bridge or epoxy, nor does he have any technical training or an advanced degree. MacPhee wrote a one-page

memorandum detailing his observations which he forwarded, along with his photographs, to his supervisors. J.S. Sweet contends that Sika also conducted an analysis based on MacPhee's report, although it is not clear whether this analysis ever existed or, if so, what it entailed. In July 1995, J.S. Sweet employees independently inspected and photographed the bridge.

Because of the problems on the bridge, WCBC refused to pay J.S. Sweet for its work. On September 14, 1995, J.S. Sweet sued the Commission in Indiana state court for, among other things, breach of contract and unjust enrichment. WCBC counterclaimed, alleging that J.S. Sweet had failed to comply with the repair contract's specifications by misapplying the epoxy. At no point during the litigation with WCBC, however, did J.S. Sweet subpoena Sika or request any of its records. The claims proceeded to a bench trial where the court found in favor of J.S. Sweet on its breach of contract claim and rejected the Commission's counterclaim. The Court of Appeals of Indiana affirmed the judgment, although it remanded for proceedings not relevant to our discussion. *See J.S. Sweet Co. v. White County Bridge Comm'n*, 714 N.E.2d 219 (Ind. Ct. App. 1999).

On April 2, 1998, J.S. Sweet sued Armstrong for tortious interference with contract, tortious interference with prospective advantage, and defamation. J.S. Sweet alleged that Armstrong had made knowingly false statements to WCBC and Sika about J.S. Sweet's performance in repairing the surface of the bridge. Prior to filing suit against Armstrong, J.S. Sweet's counsel interviewed MacPhee (who by then had left Sika) and learned that he had taken photographs and written a memorandum of his observations on the bridge. On March 11, 1998, counsel requested by letter that Sika produce the memorandum, photographs, and any related correspondence. Sika promptly advised J.S. Sweet that it could not find any of the requested materials. On February 3, 1999, J.S. Sweet subpoenaed Sika and requested again

that it hand over the report and related materials. Sika reiterated that it could not find the documents or photographs. Although it never obtained the requested materials, J.S. Sweet deposed MacPhee about his observations, recovered the photographs taken by Magners the day of MacPhee's visit, and relied on its own photographs taken of the bridge in July 1995. J.S. Sweet's suit against Armstrong, nevertheless, was unsuccessful.

In November 1995, while the WCBC litigation was still pending, J.S. Sweet and Sika signed an agreement providing that, in exchange for a $250 enrollment fee, Sika would train one of J.S. Sweet's employees in the use and application of Sika's products. Upon successful completion of the training course, Sika would designate J.S. Sweet for a period of two years as a "Sika approved contractor." Sika agreed to promote J.S. Sweet to the construction industry as capable and experienced in working with Sika products, furnish plaintiff with leads to possible construction contracts, enter a joint advertising campaign, and provide them, free of charge, with limited amounts of literature, data books, and cured product samples. J.S. Sweet undertook to use Sika's products wherever appropriate. The agreement stated expressly that J.S. Sweet would remain an independent contractor and that "nothing contained herein shall be construed as constituting [J.S. Sweet] as the agent, partner, or legal representative of Sika." (Pls.' App. at 37.) The day the parties signed the agreement, Sika gave to J.S. Sweet a one-page document entitled "SIKA APPROVED CONTRACTOR PROGRAM GUIDELINES 1995." (*Id.* at 38.) The document displays several bullet points that highlight in general terms the features of the training program. The document does not contain a signature line and was not signed by either party.

On October 13, 1999, J.S. Sweet filed the two-count complaint in this case. The first count alleges that Sika

tortiously interfered with the WCBC litigation by spoliating evidence. The second count contends that Sika breached the approved contractor agreement by failing to explain to J.S. Sweet why Sika's epoxy was delaminating from the bridge. The complaint does not include a breach of implied warranty or products liability claim against Sika arising out of the sale of its epoxy. The district court initially denied Sika's motion for summary judgment as to the spoliation claim. On a motion to reconsider, however, the court reversed itself and ruled in favor of defendant. The district court later granted summary judgment on the breach of contract claim as well, and entered judgment in favor of Sika. J.S. Sweet appeals.

## II. Discussion

A district court's grant of summary judgment is reviewed de novo. *Carreon v. Ill. Dep't of Human Servs.*, 395 F.3d 786, 790 (7th Cir. 2005). Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We draw all reasonable inferences and resolve all disputed issues of fact in favor of the nonmovant. *Carreon*, 395 F.3d at 790.

## A. Spoliation of Evidence

J.S. Sweet contends that MacPhee's report, photographs, and Sika's internal analysis of the report would have provided strong evidence that WCBC's counterclaim for breach of contract was unfounded. Although J.S. Sweet ultimately prevailed on that claim, it argues that the materials in Sika's possession, if introduced at trial, would have brought the WCBC litigation swiftly to an end. Plaintiff contends

that, instead, it was dragged through extended litigation and forced to incur unnecessary legal fees. J.S. Sweet asserts that Sika is liable to it for the harm caused by Sika's failure to maintain and produce this evidence.

Sika rejoins that, absent a subpoena or other discovery request, it had no duty to preserve the documents. It points out that the materials sought by J.S. Sweet were misplaced (or according to plaintiff, intentionally destroyed) long before it ever received a subpoena. Defendant asserts, moreover, that the loss or destruction of the materials could not have harmed J.S. Sweet because all of the information contained therein was available to plaintiff through other avenues.

The parties agree that Indiana law governs. Indiana courts define spoliation as "[t]he intentional destruction, mutilation, alteration, or concealment of evidence, usually a document." *Cahoon v. Cummings*, 734 N.E.2d 535, 545 (Ind. 2000) (quoting Black's Law Dictionary 1409 (7th ed. 1999)). The concept of spoliation has at least two distinct applications. The first is as a permissive evidentiary inference. *See, e.g., Morris v. Buchanan*, 44 N.E.2d 166, 169 (Ind. 1942). That is, if there is reason to believe that a party to a lawsuit has suppressed evidence within its peculiar possession, the trial court has discretion to instruct jurors that they may infer that, had the evidence been produced, it would have been unfavorable to that party's case. *See* Ind. Pattern Jury Instruction (Civil) 3.11 (2003); *Cahoon*, 734 N.E.2d at 545.

The second application—at issue in this case—is where spoliation is alleged as an independent tort. Indiana is one of few jurisdictions that recognizes the tort, which is analyzed either as a species of negligence or under the rubric of intentional interference with prospective or actual civil litigation. *See Murphy v. Target Prods.*, 580 N.E.2d 687, 688-90 (Ind. Ct. App. 3d Dist. 1991). Negligent or inten-

tional spoliation is actionable as a tort only if the party alleged to have lost or suppressed the evidence owed a duty to the person bringing the spoliation claim to have preserved the material. *Id.* at 690; *see also Levinson v. Citizens Nat'l Bank of Evansville*, 644 N.E.2d 1264, 1268 (Ind. Ct. App. 5th Dist. 1994). Plaintiff must also show that the duty was breached and that it was harmed as a result. *Thompson v. Owensby*, 704 N.E.2d 134, 140 (Ind. Ct. App. 1998).

### 1. Duty

Whether a duty exists is a question of law decided by the court after balancing three factors: "1) the relationship between the parties, 2) the reasonable foreseeability of the type of harm to the type of plaintiff at issue, and 3) the public policy promoted by recognizing an enforceable duty." *Id.* at 136; *see also Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). The Indiana courts have refused to recognize a duty to preserve evidence absent "an independent tort, contract, agreement, or special relationship." *Murphy*, 580 N.E.2d at 690.

J.S. Sweet contends that its purchase of over $100,000 worth of Sika's epoxy and its status as a Sika approved contractor establish a special relationship between the parties. It argues, furthermore, that Sika knew or reasonably could have foreseen that the MacPhee report, photos, and Sika's internal analysis of the report were critical to the WCBC litigation, and that the loss or destruction of those materials would have harmed J.S. Sweet. It asserts that imposing a duty in this case would enhance motorists' safety by preserving evidence that will expose those at fault when public works projects go awry.

We decline to recognize a duty under these circumstances. First, we disagree with plaintiff's contention that a special relationship exists between the parties. J.S. Sweet purchased Sika's epoxy through a third-party distributor in an

arm's-length transaction in the same way as any of Sika's other customers. An arrangement as ordinary as this cannot be considered special. Nor does the approved contractor agreement help J.S. Sweet's argument. Plaintiff concedes that the agreement does not expressly obligate Sika to preserve evidence. Moreover, the contract forecloses the possibility that it creates a special relationship by implication: "[J.S. Sweet] is, and in all events shall be, an independent Contractor and nothing contained herein shall be construed as constituting [J.S. Sweet] as the agent, partner, or legal representative of Sika or [sic] any purpose whatsoever." (Pls.' App. at 37.)

Second, Sika could not reasonably have foreseen that its failure to maintain the evidence would harm J.S. Sweet. MacPhee's report was merely a summary of what an interested layperson observed on the bridge. His photographs were equally commonplace. Sika could anticipate reasonably that J.S. Sweet would do its own investigation, make its own observations, and take its own photographs. (And as it turned out, plaintiff did.) Plaintiff emphasizes, however, that it was damaged by the loss or intentional destruction of Sika's internal analysis of the report, rather than by the disappearance of the report itself, and that Sika should have foreseen this harm. We find this argument unpersuasive. By plaintiff's allegations, the internal analysis relied on observations made in the MacPhee report, which were readily available to Sweet. Sika could justifiably expect Sweet to do its own homework and come to its own conclusions.[1]

---

[1] J.S. Sweet heavily emphasizes evidence that, in 1996, Sika's corporate counsel informed one of plaintiff's employees that he had "the Sweet file" on his desk. Plaintiff claims that this demonstrates that Sika had conducted an internal analysis of MacPhee's observations and knew that its analysis would be important to J.S. Sweet in the WCBC litigation. There is no indication, how-
(continued...)

Third, public policy considerations counsel strongly against recognizing a duty under these circumstances. A ruling in favor of J.S. Sweet would impose a significant but undefined burden on an unpredictable class of persons. Plaintiff has not proposed, nor can we divine, any principled way to decide which records should be maintained, for how long, or by whom. A rule of such uncertain scope appears especially ill-advised given that J.S. Sweet had the option of subpoenaing Sika, thereby putting it on notice that it possessed evidence relevant to the WCBC litigation. *See* Ind. Trial P. R. 34(C) (allowing for the subpoena of non-parties); *see also Murphy*, 580 N.E.2d at 690 ("Prior to receiving a request as contemplated under [Rule 34(C)], the non-party ought to have no legal concerns about potential evidence in his possession, absent any promises, contracts, statutes or special circumstances."). What we can say with certainty is that any holding in favor of plaintiff would require us to expand the spoliation tort vastly beyond where the Indiana courts have been willing to go. *See*, *e.g.*, *id.* (refusing to impose a duty on an employer to preserve evidence relevant to its employee's lawsuit against a third party); *Levinson*, 664 N.E.2d at 1268-69 (holding that the tort of spoliation does not include a duty to avoid causing a mistrial); *Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 663-64 (Ind. Ct. App. 2002) (spoliation tort does not apply to testimonial evidence).

We have located only one reported case where an Indiana court has recognized a duty to preserve evidence under the

---

[1] (...continued)
ever, that "the Sweet file" contained an analysis of the MacPhee report. Assuming that it did, corporate counsel's statement that he possessed the file establishes at most that he had a copy of the analysis as late as 1996. It says nothing about the content of the analysis. Thus, it does not undermine our conclusion that Sika would have been reasonable to expect J.S. Sweet to conduct its own investigation.

tort of spoliation. *See Thompson*, 704 N.E.2d at 139. The plaintiffs in *Thompson* were the parents of a young girl who had been mauled by a dog after it broke free of its chain. The parents sued the chain manufacturer, the dog's owners, and the owners' landlords. The landlords' insurance company took possession of the allegedly defective chain before anyone had an opportunity to examine it. When the insurance company lost the chain, the parents sued it, claiming that its failure to preserve the evidence undermined the parents' case against the chain manufacturer, dog owners, and landlords. The appellate court reversed the trial court's dismissal of the spoliation claim and held that the insurance company had a duty to preserve the evidence.

*Thompson* is plainly distinguishable from this case. In *Thompson*, the party alleged to have spoliated the evidence had a direct financial stake in the outcome of the underlying litigation. Had the landlords been found liable, the insurance company would have had to indemnify them. And if the key evidence implicating the landlords disappeared, but for spoliation liability, the insurer would have been off the hook. We have no similar reason to be suspicious of Sika's motives because WCBC's counterclaim could have been resolved on a number of grounds that would not have impacted Sika financially. Moreover, the broken dog chain was obviously critical to the plaintiffs' case in *Thompson*, and the insurance company's decision to take exclusive possession of the chain shows that it recognized that fact. By contrast, Sika could have expected J.S. Sweet to obtain the information found in MacPhee's report elsewhere. Given our reluctance as a court sitting in diversity to expand state law, *see, e.g.*, *King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir. 1997), we refuse to recognize a duty in this case.

### 2. Harm

Even if Sika had a duty to preserve the evidence, J.S. Sweet

would also have to show that the duty was breached, that it was harmed by the breach, "and that the harm resulted in damages that can be proven with reasonable specificity." *Thompson*, 704 N.E.2d at 140. A spoliation claim is viable only if the party who allegedly failed to preserve the evidence possessed it exclusively. *Loomis*, 764 N.E.2d at 663.

Many of the considerations that informed our duty analysis also lead us to conclude that the destruction or loss of the report and related materials did not, as a matter of law, harm Sweet. Anything MacPhee observed on the bridge could have been (and likely was) observed by J.S. Sweet. There is no indication that the conditions on the bridge changed between MacPhee's visit in May 1995 and plaintiff's arrival two months later. Even if things had changed, J.S. Sweet deposed MacPhee and asked him about his recollections. Moreover, plaintiff obtained photographs taken the same day as MacPhee's visit. None of the allegedly spoliated evidence, therefore, was in Sika's exclusive possession. *See id.* Nor could the loss or suppression of Sika's internal analysis have harmed J.S. Sweet. As explained above, that analysis was based on observations that plaintiff could have made. J. S. Sweet also had the opportunity to depose Sika employees about what conclusions, if any, they drew from MacPhee's report. The district court held correctly that J.S. Sweet failed, as a matter of law, to establish that it was harmed by the loss of this evidence.

## B. Breach of Contract

J.S. Sweet relies on the approved contractor agreement, not only to support its argument that a special relationship existed between the parties, but also as the basis for its breach of contract claim. Plaintiff contends that Sika violated the agreement by failing to provide it with technical

support.[2] "The primary and overriding purpose of contract law is to ascertain and give effect to the intentions of the parties." *Indiana-American Water Co. v. Town of Seelyville*, 698 N.E.2d 1255, 1259 (Ind. Ct. App. 1998). "In interpreting a written contract, the court should attempt to determine the intent of the parties at the time the contract was made as discovered by the language used to express their rights and duties." *Id.* (internal citations omitted). "When the language of a written contract is not ambiguous . . . its meaning is a question of law 'for which summary judgment is particularly appropriate.'" *Hyperbaric Oxygen Therapy Sys., Inc. v. St. Joseph Med. Ctr. of Ft. Wayne, Inc.*, 683 N.E.2d 243, 247 (Ind. Ct. App. 1997) (quoting *Fetz v. Phillips*, 591 N.E.2d 644, 647 (Ind. Ct. App. 1992)).

Although not entirely clear from its papers, J.S. Sweet appears to argue that the obligation to provide technical support requires that Sika explain to it why the epoxy was peeling away from the surface of the New Harmony bridge. As support for this argument, plaintiff points not to the terms of the approved contractor agreement, but to the following language from the one-page flyer distributed by Sika:

   - ANNUAL CONTRACTOR REVIEW TO BE HELD WITH EACH SIKA APPROVED CONTRACTOR COVERING:

   . . . .

---

[2] Plaintiff also alleges that Sika breached the contract by failing to enter a joint advertising campaign and provide it with cured product samples. These arguments were not developed in J.S. Sweet's lead brief and, although discussed in its reply, are forfeited. *See Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 665-66 (7th Cir. 1995) (arguments pressed before the district court but not raised in appellant's opening brief are forfeited even if developed in reply brief).

> - DISCUSSION OF CONTRACTOR NEEDS (TRAIN-
> ING, PRODUCTS INFORMATION, FIELD SUPPORT,
> ETC.).

(Pls.' App. at 38.)

This argument suffers from numerous flaws. First, there is no indication from the face of either the approved contractor agreement or the flyer that the flyer modifies the contract between the parties. The flyer is not signed, and neither instrument explicitly incorporates the other. Second, assuming that the flyer comprises a portion of the contract, it mentions only "field support"; neither document refers to "technical support." Nevertheless, J.S. Sweet points to the deposition testimony of one of its employees stating that he thought the flyer guaranteed technical support. Plaintiff argues that summary judgment was improper because a jury must decide whether the employee's interpretation was correct. But the employee's misapprehension about what the flyer says cannot be used to rewrite the terms of the document or create an issue of fact for trial. *See, e.g., Heredia v. Sandler*, 605 N.E.2d 1212, 1216 (Ind. Ct. App. 5th Dist. 1993) ("[T]his court will not rely on, nor are we bound by, an erroneous construction placed upon the contract by a party.").

Third, even if "field support" means "technical support," the flyer does not obligate Sika to provide this service. Rather, it merely contemplates that Sika's annual review with Sweet will "COVER[ ]" a "DISCUSSION OF CON-TRACTOR NEEDS," including the need for field support. Although plaintiff asserts that the flyer is ambiguous and therefore must be construed against Sika, its drafter, we hold that the document cannot reasonably be interpreted as obligating Sika to explain the problems on the bridge. Accordingly, the district court properly granted summary judgment in favor of defendant on the breach of contract claim.

### III. Conclusion

For the reasons stated herein, we AFFIRM the district court's grant of summary judgment.


A true Copy:

      Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*