ALLSTATE INSURANCE COMPANY as Successor in Interest to Northbrook Excess & Surplus, f/k/a Northbrook Insurance Company, et al., Appellants–Defendants,

v.

DANA CORPORATION, Appellee–Plaintiff.

Dana Corporation, Appellant–Plaintiff,

v.

Northbrook Excess & Surplus Insurance Company, Appellee–Defendant.

Nos. 49A02–9909–CV–666, 49A02–9906–CV–430.

Court of Appeals of Indiana.

Nov. 9, 2000.

Maxwell Gray, Lowe Gray Steele & Darko, Indianapolis, Indiana, Stephen D. Cuyler, Thomas J. Castano, Cuyler & Burk, Parsippany, New Jersey, Attorneys for Allstate Insurance Co.

Robert F. Walsh, Susan M. Chesler, Melito & Adolfsen, New York, New York, Steven S. Lovern, Schreckengast Lovern & Helm, Indianapolis, Indiana, Attorneys for Hartford Accident & Indemnity Company.

George M. Plews, Frederick D. Emhardt, Plews Shadley Racher & Braun, Indianapolis, Indiana, Attorneys for Dana Corporation.

## OPINION

SHARPNACK, Chief Judge

This consolidated appeal arises from a suit filed by Dana Corporation ("Dana") against Allstate Insurance Company ("Allstate") and other insurance companies that have insured Dana in the past.[1] Dana asserts that Allstate is contractually bound

---

1. Allstate is a named party in this appeal because it is a successor in interest to Northbrook Excess and Surplus Insurance Company ("Northbrook"), which provided excess insurance to Dana from 1977 until 1982. Although Northbrook, not Allstate, was Dana's insurer during the times relevant to this case, for simplicity's sake we shall refer to Allstate when discussing Northbrook's policies' provisions.

Dana has settled with all of its insurers except Allstate, and, with one exception that we discuss below, they are not parties to this appeal.

to indemnify it for costs arising from environmental cleanup operations at numerous properties that Dana owned or used for manufacturing or storage. Dana and Allstate both filed a number of dispositive motions with the trial court in regard to various provisions of Allstate's insurance contracts, and they are each appealing the trial court's resolution of those motions. Dana raises three issues, which we expand and restate as:

1) whether the trial court erred when it denied Dana's motion for reconsideration of its previous decision that the owned property exclusion in Allstate's policies precluded property damage liability coverage for costs imposed upon Dana to clean up pollution at sites owned by Dana;

2) whether the trial court erred when it denied Dana's motion for reconsideration of its previous decision that Allstate is required to indemnify Dana for Dana's environmental liabilities only if those liabilities were for damage that occurred during a policy period;

3) whether the trial court erred when it determined that Dana is judicially estopped from arguing that its insurance policies with Hartford Accident and Insurance Company ("Hartford") contain aggregate limits of liability on property damage;[2] and

4) whether the trial court erred when it granted Allstate's motion for partial summary judgment on the question of whether Hartford's policies contain aggregate limits of liability for property damage.

Allstate raises four issues,[3] which we consolidate and restate as:

5) whether the trial court erred when it granted Dana's motion for partial summary judgment on the question of whether the personal injury provisions of Allstate's policies provide coverage for environmental cleanup costs such as those imposed upon Dana;

6) whether the trial court erred when it granted Dana's motion for summary judgment as to Allstate's liability for cleanup costs imposed on Dana at the Old Forge landfill ("Old Forge"); and

7) whether the trial court erred when it awarded prejudgment interest to Dana as part of the Old Forge summary judgment.

We affirm in part and reverse in part.

The relevant facts follow. We begin by referring to our opinion from the first appeal in this case:

> The designated evidence shows that Dana is a manufacturer of automotive components with facilities across the United States and worldwide. Dana has obtained both primary and excess comprehensive general liability ("CGL") insurance coverage for its operations from a variety of insurers[, including primary and excess GCL coverage by Hartford from 1978 to the present and excess GCL, or "umbrella" coverage by Allstate from 1977 to 1982]....

> Sixty-three of Dana's facilities, located in nineteen states, have become the subject of various governmental agency or third party actions regarding alleged environmental contamination. Dana has made claims for coverage under its CGL insurance policies and has been denied coverage for the most part. As a result, Dana filed suit against fifty-six insurers seeking a declaration that it is entitled

---

**2.** Hartford was a defendant in this suit but subsequently settled with Dana. Despite the settlement, Hartford received permission from the trial court to intervene in this appeal. Hartford also challenges the trial court's ruling on the existence of aggregate limits in its policies with Dana. Because Hartford's arguments do not differ substantially from Dana's we will not generally differentiate between these parties in our discussion.

**3.** Pursuant to an order of this court, Dana's appeal and Allstate's appeal have been consolidated to resolve this complex and long-running case more efficiently.

to indemnification and defense under its primary, umbrella, and excess CGL insurance policies. . . .

Dana filed a motion for partial summary judgment against [one of its primary CGL insurers] seeking to establish the meaning of certain policy terms, to require [the insurer] to defend, and to obtain reimbursement of damages and legal expenses already incurred. The trial court granted Dana's motion.

*Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 288 (Ind.Ct.App. 1997), *trans. denied*, 698 N.E.2d 1191 ("*Dana I*"). We affirmed the trial court's grant of partial summary judgment to Dana. *Id.* at 298.

After the first appeal was resolved, the trial court set fifteen different sites for trial, to be tried in three sets of five sites. The trial court later amended the case management plan, determining that the first trial would determine the extent of Allstate's duty to indemnify Dana for Dana's liabilities at the Old Forge site alone and that trial for the other four sites in the set would be delayed until a later date.

While the case management plan was being revised, the parties filed four of the five motions that are the subject of this appeal. Dana filed a motion for partial summary judgment seeking a ruling that Allstate is liable for cleanup costs that Dana incurred at ten properties that were owned by Dana, despite the existence of an owned property exclusion in Allstate's policies. Dana filed a second motion for partial summary judgment seeking a ruling that Allstate could be held liable for "all sums," or the entire amount of Dana's liability for damages, up to Allstate's limits under each policy that was triggered. Dana then filed a third motion for partial

summary judgment seeking a ruling that the personal injury coverage in Allstate's policies extended to Dana's environmental liabilities. Subsequently, Allstate filed a motion for partial summary judgment in which it asked the trial court to declare that Dana's underlying insurance policies with Hartford had no aggregate limits on property damage coverage.

The trial court addressed Dana's motion on the "owned property" clause first. Because the trial court had previously entered summary judgment on this issue against Dana, it addressed Dana's motion as a request to reconsider its ruling and denied the motion, determining that the property damage to eight of the ten sites was not covered under Allstate's policies.[4] The trial court ruled upon the "all sums" liability issue next. Because Dana had previously moved for partial summary judgment on this issue and had lost, the trial court addressed Dana's motion as a motion for reconsideration. The trial court denied Dana's motion, holding that Allstate would only be obligated to pay under a triggered policy for Dana's liability for damages that took place during the period of that policy. However, the trial court granted Dana's motion for partial summary judgment on the personal injury issue, determining that the personal injury provisions of Allstate's policies provided coverage for Dana's environmental liabilities. Finally, the trial court granted Allstate's motion for partial summary judgment on the aggregate limits issue, determining that Hartford's underlying policies do not provide aggregate limits to property damage liability coverage.

After these partial summary judgment motions were resolved, Dana filed a motion for summary judgment as to the Old Forge site, claiming that Allstate was required to indemnify Dana in full for its

---

4. The trial court determined that Dana had presented evidence that the environmental damage at two of the ten sites, Angola, Ohio, and Hagerstown, Indiana, had spread onto property that was not owned by Dana, and so the trial court did not include those sites in its findings of fact and conclusions of law on this issue. None of the parties are appealing the trial court's determination as to these two sites, and we will also exclude those sites from consideration.

liability there. After reviewing the parties' memorandums and hearing oral argument, the trial court granted Dana's motion and determined that Allstate was liable to Dana for $3,004,420.00 plus $1,594,894.30 in prejudgment interest for a total of $4,599,314.30. In addition, the trial court certified its rulings on the "all sums" issue, the aggregate limits issue, and the personal injury coverage issue as final for the purposes of appeal. Subsequently, the trial court also certified its ruling on the owned property issue as final.

Before addressing the issues, we note our standard of review. When reviewing a grant or denial of summary judgment, we use the same standard as the trial court: whether the pleadings and evidence demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Dana I,* 690 N.E.2d at 290. The appellant bears the burden of proving that the trial court erred. *See Rosi v. Business Furniture Corp.,* 615 N.E.2d 431, 434 (Ind.1993). A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue. *Scott v. Bodor, Inc.,* 571 N.E.2d 313, 318 (Ind.Ct.App.1991). We construe the pleadings, affidavits, and designated materials in a light most favorable to the nonmovant and give careful scrutiny to assure that the nonmovant is not improperly prevented from having its day in court. *Dana I,* 690 N.E.2d at 291.

 Summary judgment based upon construction of an insurance contract is a determination, as a matter of law, that the contract is unambiguous and that it is unnecessary to resort to the rules of contract construction in order to ascertain the contract's meaning. *Terre Haute First Nat.*

*Bank v. Pacific Employers Ins. Co.,* 634 N.E.2d 1336, 1337 (Ind.Ct.App.1993). The provisions of an insurance contract are subject to the same rules of construction as are other contracts, and the construction of a written contract is a question of law for which summary judgment is particularly appropriate. *Id.* If the language of a policy is clear and unambiguous, it should be given its plain and ordinary meaning. *See Dana I,* 690 N.E.2d at 295. Under Indiana law, an insurance policy is ambiguous if reasonable persons could honestly differ as to the meaning of the policy language. *Id.* Where there is ambiguity, insurance policies are to be construed strictly against the insurer. *Id.* An ambiguity does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other. *Id.*

I.

The first issue raised by Dana is whether the trial court erred when it denied Dana's motion for reconsideration of its previous decision that the owned property exclusion in Allstate's policies precluded property damage liability coverage for costs imposed upon Dana to clean up pollution at sites owned by Dana. We expressly reserved a ruling upon this question in our resolution of the first appeal in this case. *See id.* at 298.

 Dana argues that the owned property exclusion does not bar indemnification for six of the eight sites at issue here because the contamination at those six sites has reached the groundwater, and Indiana law provides that people do not own the groundwater that flows under their properties. Allstate replies that under Indiana law, Dana does own the groundwater beneath its properties, and therefore, the owned property exclusion bars coverage.[5]

**5.** Dana contends that Allstate is estopped from arguing that the owned property exclusion bars coverage for environmental liability

claims because Allstate has argued in another case that such claims are *not* barred by owned property exclusion clauses. Our re-

In order to resolve this issue, we must interpret the five excess GCL policies that Allstate provided to Dana from 1977 to 1982. The three policies that provided coverage from 1977 to 1980 all provide, in relevant part: "This policy shall not apply to ... Property Damage to property owned by any Insured; . . . ." Record, pp. 6461–6462, 6531–6532, 6544–6545. Furthermore, all three policies define "property damage" as "loss of or direct damage to or destruction of tangible property (other than property owned by any Insured) and which results in an Occurrence during the policy period." Record, pp. 6459, 6523, 6542.

The owned property exclusion was subsequently redefined in Allstate's two policies that provided coverage from 1980 to 1982, stating:

This policy shall not apply ... under PROPERTY DAMAGE to injury to or destruction of or loss of:

 (1) property owned by any insured, or

 (2) property rented to, occupied or used by or in the care, custody or control of the INSURED to the extent that any INSURED is required to provide insurance thereof under any contract or agreement, . . . .

Record, pp. 6598, 6630.[6]

We turn to long-established precedent on groundwater ownership to resolve Dana's assertion that it does not own the contaminated groundwater beneath six of the eight sites at issue. In *New Albany &*

*Salem R.R.*, the plaintiff's well was maintained by groundwater that came from an underground spring on another property and flowed onto his property. *New Albany & Salem R.R. v. Peterson*, 14 Ind. 112, 112 (Ind.1860). The defendant railroad company constructed a railroad on nearby property, and in the course of doing so severed the connection between the spring and the plaintiff's well, causing the well to dry up. *Id.* at 112. The plaintiff asserted that he was damaged by the loss of the groundwater, but the Indiana Supreme Court determined that he was not entitled to recover for his loss. *Id.* at 113–115. Our supreme court concluded that the railroad company was free to excavate the roadbed for the railroad, in keeping with its ownership and control over its property and the groundwater beneath it, and if its excavations prevented groundwater from reaching the plaintiff's property, he had no cause of action. *Id.* at 115.

In the course of recognizing a landowner's right to use the groundwater under his or her property as he or she sees fit, our supreme court in *Peterson* adopted a form of the English Rule [7] to resolve disputes involving ownership of groundwater. *Id.* at 114–115. However, as this court has previously recognized, Indiana has not adopted the English Rule in its strict form, but rather in a modified form. *See City of Valparaiso v. Defler*, 694 N.E.2d 1177, 1180 (Ind.Ct.App.1998), *reh'g denied, trans. denied*, 714 N.E.2d 164. Although

---

view of the record reveals that Dana did not present this contention to the trial court. It is well established that when challenging an adverse grant of summary judgment, a party cannot rely upon a theory that was not properly before the trial court. *Otto v. Park Garden Assoc.*, 612 N.E.2d 135, 139 (Ind.Ct.App. 1993), *reh'g denied, trans. denied*. Consequently, Dana has waived this estoppel argument for appellate review. *See id.*

**6.** Both of the owned property exclusions, by their terms, apply only to Dana's claims as to liability for property damage. ·If Dana is seeking indemnification from Allstate for personal injury liability at the eight sites at issue,

the owned property exclusion does not bar such a claim.

**7.** The English Rule has recently been described as follows:

Ground water is part of the land in which it is present and belongs to the owner of that land. It may be put to use to the fullest extent to further enjoyment of the land, however this right does not extend to causing injury gratuitously or maliciously to nearby lands and their owners.

*Wiggins v. Brazil Coal & Clay Corp.*, 452 N.E.2d 958, 964 (Ind.1983), *reh'g denied*.

it addresses somewhat different facts, *Tyner* is a useful illustration of this point. *People's Gas Co. v. Tyner*, 131 Ind. 277, 31 N.E. 59 (Ind.1892). In that case, a homeowner sued a utility company that intended to increase the output of one of its natural gas wells that was located near the homeowner's property by exploding nitroglycerin within the well. *Id.* at 278, 31 N.E. at 59. The homeowner argued, among other claims, that the explosion would have the effect of drawing natural gas from under his home, thereby wrongfully appropriating his property. *Id.* at 279, 31 N.E. at 59. Under the English Rule in its strictest sense, the homeowner would have owned the natural gas under his property. However, our supreme court did not apply the rule in its strictest sense. *Id.* at 281–281, 31 N.E. at 60. Instead, although recognizing that groundwater, petroleum, and gas are part of the land under which they lie and belong to the owner of the land, the court indicated that ownership of such subsurface resources is dependent upon possession and use of those resources, noting " '[p]etroleum oil, like subterranean water, is included in the comprehensive idea which the law attaches to the word "land," and is a part of the soil in which it is found. *Like water, it is not the subject of property, except while in actual occupancy,* . . . .' " *Id.* at 281, 31 N.E. at 60 (emphasis added) (quoting JOHN M. GOULD, WATERS § 291 (1883)). The court further stated that " '[i]f an adjoining, or even a distant, owner, drills his own land, and taps your gas, so that it comes into his well *and under his control,* it is no longer yours, but his.' " *Id.* at 282, 31 N.E. at 60 (emphasis added) (quoting *Westmoreland & Cambria Nat. Gas Co. v. De Witt*, 130 Pa. 235, 18 A. 724, 724–725 (1889)). Consequently, our supreme court determined that if the utility company did draw natural gas from beneath the homeowner's land, then the company would be acting within its rights and the homeowner had no cause of action for the loss of the natural gas. *Id.* at 282, 31 N.E. at 60. Therefore, in *Tyner* the Indiana Supreme

Court applied a modified English Rule wherein ownership of groundwater and similar natural resources depends upon possession and use of the groundwater. *Id.* at 282, 31 N.E. at 60.

The modified English Rule was applied once again in *Wiggins,* wherein landowners sued a mining company that, in the course of pumping water from one of its strip mines, drained all of the water from a lake on the landowners' properties. *Wiggins,* 452 N.E.2d at 960–961. Our supreme court affirmed the trial court's determination that, although water was incontrovertibly taken from the landowners' properties through the actions of the mining company, the plaintiffs had no cause of action. *Id.* at 964. The court noted that the water in the lake was essentially groundwater, and as such it was merely obeying the "natural law of percolation" when it seeped into the adjacent strip pit in response to the mining company's actions. *Id.* Because the water was acting in accordance with nature, and the mining company did not act maliciously or gratuitously, the landowners had no remedy for their losses. *Id.* An unexpressed, but integral, aspect of our supreme court's holding in *Wiggins* is that the landowners did not own or control the water in their lake. Otherwise, the landowners would have lost a valuable asset, and the mining company would have been required to compensate the landowners for the loss of that asset. *See Defler,* 694 N.E.2d at 1181.

■■■■ Based upon this review of precedent, we agree with Judge Staton's conclusion in *Defler* that "groundwater is not a landowner's property until the landowner takes it into actual possession." *Id.; see also Tyner,* 131 Ind. at 282, 31 N.E. at 60. Unless and until a landowner takes the groundwater into actual possession, it remains the property of the State. Consequently, we hold that the owned property exclusion in Allstate's policies only prevents indemnification for contaminated groundwater where the landowner actually

possesses the groundwater, thereby establishing ownership.

The next step is to determine whether Dana owned the contaminated groundwater at the Dana-owned sites at issue. Actual possession of groundwater requires more than merely permitting it to percolate according to its natural course through one's land, as the plaintiffs did in *Wiggins*. *Wiggins*, 452 N.E.2d at 964. A party actually possesses the groundwater when he or she removes it from its natural state for his or her use. *See, e.g., id.* (agreeing with the trial court that the mining company made "beneficial use" of the groundwater that entered its property by pumping the groundwater out of its mining pits).

According to the joint statement of facts submitted by the parties, the groundwater contamination at all of the sites was the result of leaks of industrial wastes from sources such as underground storage tanks, aboveground storage tanks, and lagoons. There is no evidence that Dana had removed the polluted groundwater from its natural course for Dana's use. Consequently, Dana neither possessed nor owned the groundwater under its sites. *See, e.g., Wiggins*, 452 N.E.2d at 964. Therefore, because the polluted groundwater at the six sites was not "owned" by Dana or under the "custody or control" of Dana, the owned property exclusion does not prevent Dana from obtaining indemnification for liability at those sites. Record, pp. 6461–6462, 6531–6532, 6544–6545, 6598, 6630. We reverse the trial court's judgment on this issue because Allstate is not entitled to judgment as a matter of law.

One additional point requires discussion. Although Indiana applies a modified form of the English Rule to ownership of groundwater, it remains true that the soil on and beneath a person's property is a part of the property and as such is the property of the landowner. *See Tyner*, 131 Ind. at 281, 31 N.E. at 60. Consequently, at sites where contamination is limited to the soil, the owned property exclusion bars indemnification for property damage. As we noted above, Dana asserts that six of its eight sites contain groundwater contamination. Therefore, the pollution at the remaining two sites must be limited to the soil itself, and so Dana is not entitled to indemnification for losses at those sites. However, Dana has not identified which two sites contain no groundwater pollution, and we are unable to identify those sites from the record. As a result, we must remand to the trial court so that it may identify the two sites for which Dana may not receive indemnification.

## II.

The second issue raised by Dana is whether the trial court erred when it denied Dana's motion for reconsideration of its previous decision that Allstate is required to indemnify Dana for Dana's environmental liabilities only if those liabilities were for damage that occurred during a policy period. Dana claims that Allstate is obligated to indemnify it for "all sums" of its liability for damages arising out of an occurrence, subject to policy limits, and that its obligation to pay would be joint and several with that of any other insurer who had an obligation to pay under its policy. Allstate claims that this issue is moot, and, in the alternative, that it is liable only for property damage that occurs during the policy period. Under Allstate's second theory, all carriers that have a duty to indemnify an insured for damages would have those damages prorated among them.

### A.

Allstate first argues that this issue is moot because, regardless of how Dana's damages are allocated among applicable policies, Allstate claims that it is entitled to a contribution from Dana for settlement payments that Dana has already received from its other insurers. Thus, Allstate reasons that even if it is found to be liable

to indemnify Dana for the total damages arising out of an occurrence, as Dana contends, then Allstate's entitlement to a contribution from Dana to account for the other insurers' payments to Dana would effectively pro rate Dana's liabilities among the applicable policies.

■■■ As we have stated previously, "An issue becomes moot when it is no longer live or when the parties lack a legally cognizable interest in the outcome." *Columbus Bd. of Zoning Appeals v. Wetherald,* 605 N.E.2d 208, 210 (Ind.Ct.App. 1992), *reh'g denied, trans. denied.* When the principal questions in issue have ceased to be matters of real controversy between the parties, the errors assigned become moot questions and we will not retain jurisdiction to decide them. *Plumlee v. Monroe Guar. Ins. Co.,* 655 N.E.2d 350, 358 (Ind.Ct.App.1995), *reh'g denied, trans. denied.*

Contrary to Allstate's assertion, this issue is not rendered moot by Allstate's contribution claim because that claim is not now before us. The trial court has yet to determine Allstate's liability to indemnify for cleanup costs at each of Dana's sites, and that liability may only be determined after considering a number of variables that are not in the record, such as the extent of damage at each site. Neither the trial court nor we may determine whether Allstate is entitled to a contribution to offset merely hypothetical liabilities. Because the question of Allstate's liability has yet to be resolved, Allstate's contribution claim is not ripe for adjudication, and that claim cannot render this issue moot. Consequently, we must address the trial court's ruling on this issue on the merits. *See id.*

### B.

■■■ The resolution of this issue turns on what the policies provide. If the policies provide, as Allstate contends, that Allstate is liable to indemnify only for damage that occurs during a policy period, then that is the extent of Allstate's liability. If the policies provide, as Dana contends, that Allstate is liable for all damages once coverage is triggered by an occurrence without regard to whether the damages extend beyond a policy period, then that is the extent of Allstate's liability. Under both circumstances, the existence of other coverage may affect the amounts payable either under policy terms or equitable principles. Furthermore, under both circumstances, policy limits are applicable and policy provisions regarding the relationship between underlying primary insurance and the excess insurance provided by the policies are applicable.

We begin with the governing contract provisions. The three Allstate policies that provided coverage from 1977 to 1980 provide, in relevant part:

> [Allstate] hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability
>
> A. imposed upon the Insured by law, or
>
> B. assumed under contract or agreement by the Named Insured, for damages on account of
>
> A. Personal Injuries
>
> B. Property Damage
>
> \* \* \* \* \*
>
> caused by or arising out of each Occurrence happening anywhere in the world.

Record, pp. 6458, 6528, 6541. These policies define an "Occurrence," in relevant part, as:

> an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in Personal Injury [or] Property Damage ... neither expected nor intended from the standpoint of the Insured.... All such Personal Injury [or] Property Damage ... caused by one

event or by continuous or repeated exposure to substantially the same conditions shall be deemed to result from one Occurrence.

Record, pp. 6460, 6530, 6543. In these policies, "property damage" is defined as "loss of or direct damage to or destruction of tangible property (other than property owned by any Insured) and which results in an Occurrence during the policy period." Record, pp. 6459, 6529, 6542.

The two policies that provided coverage from 1980 to 1982 provide, in relevant part, that Allstate will:

indemnify the INSURED for the ULTIMATE NET LOSS, in excess of the greater of the RETAINED LIMIT, or UNDERLYING LIMIT, for all sums which the INSURED shall be obligated to pay by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under contract or agreement for damages and expenses, because of:

(1) PERSONAL INJURY [or]

(2) PROPERTY DAMAGE, . . .

* * * * *

to which this policy applies, caused by an OCCURRENCE, happening anywhere in the world.

Record, pp. 6597, 6629. These policies define an "occurrence" as follows, in relevant part:

[W]ith respect to PERSONAL INJURY and PROPERTY DAMAGE coverage, OCCURRENCE shall mean an accident or event including continuous or repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY or PROPERTY DAMAGE neither expected nor intended from the standpoint of the INSURED. For the purpose of determining the limit of [Allstate's] liability, all PERSONAL INJURY and PROPERTY DAMAGE arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one OCCURRENCE.

Record, pp. 6597, 6629. These two policies define "property damage" as:

1) Physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, and

2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an OCCURRENCE during the policy period.

Record, pp. 6597, 6629.

The trial court determined that each policy "is liable only for that portion of the damages which occurred during that particular policy period." Record, p. 3909. Dana asserts that Allstate is responsible for indemnifying "all sums" of Dana's liability for damages if those damages arose out of an occurrence while an Allstate policy was in effect. Allstate responds that the policies limit Allstate's responsibility to indemnify Dana to liability incurred for property damage that took place "during the policy period," thereby indicating that indemnification for Dana's liability should be distributed among applicable policies on a pro rata basis. This is an issue of first impression in Indiana.

We find Dana's argument persuasive. All five of the policies provide that Allstate will indemnify Dana for "all sums" that Dana becomes obligated to pay arising out of personal injury or property damage that is caused by an occurrence. The "all sums" provision is the only policy language that states Allstate's duty to pay. This provision is unambiguous and plainly provides that Allstate must indemnify Dana for *all* of its liability.

It is only in the definitions of "occurrence" and "property damage" that there is any language that might impose some temporal limit to the damage for which indemnification is payable, and that language is not plain. There is some varia-

tion in the language of the policies that covered 1977–1980 from the policies that covered 1980–1982. The definitions of "occurrence" in all five policies are essentially the same. The definitions of "property damage" are not.

An "occurrence" is, in relevant part, "an accident [or] event including continuous or repeated exposure to conditions which results, during the policy period, in ... Property Damage.... All ... Property Damage ... caused by one event or by continuous or repeated exposure to substantially the same conditions shall be deemed to result from one Occurrence."[8] Record, pp. 6460, 6530, 6543. The "occurrence" definition language requires that there be property damage during the policy period for there to be an occurrence, but it does not in itself nor in combination with the "all sums" language of the insuring clause limit the obligation to indemnify to liability for damage that takes place only during the policy period.

The definition of "property damage" in the 1977–1980 policies appears simple enough. It is "loss of or direct damage to or destruction of tangible property ... which results in an Occurrence during the policy period." Record, pp. 6459, 6529, 6542. The circularity of the language is apparent. An "occurrence" results during the policy period in "property damage" which is damage that results in an "occurrence" during the policy period. Again, by itself or in combination with the definition of an "occurrence" and the "all sums" language of the insuring clause, the definition of property damage does not limit the obligation to indemnify to damage that takes place only during the policy period.

The definition of "property damage" in the 1980–1982 policies is different from the 1977–1980 definition. It is:

1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at anytime resulting therefrom, and

2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an OCCURRENCE during the policy period.

Record, pp. 6597, 6629.

Again, there is circularity and some confusion. In the first part, property damage appears to be limited to injury or destruction that occurs during the policy period, except that loss of use due to such injury or destruction is included in "property damage" no matter when such loss of use takes place. In the second part, loss of use of property that has not been injured or destroyed is included in "property damage" so long as the loss of use is "caused by" an "occurrence" during the policy period. If an occurrence requires property damage and property damage requires injury or destruction of property, it would seem that there could not be such a thing as loss of use of property that was not injured or destroyed and that was caused by an occurrence. In any event, in the instant case there is certainly a loss of use of land and water that has been contaminated by pollutants. The damage here is within the contemplation of the term "property damage" in the 1980–1982 policies.

Taken as a whole, the best that can be said of all of the policies is that they do not unambiguously limit the obligation of Allstate to indemnify Dana for liability only for property damage that took place during the policy period. Therefore, we construe the policies against the drafter, Allstate, to provide for indemnification of all sums that Dana has liability for arising out of an occurrence during a policy period without regard for the fact that some of that damage may continue beyond the term of the policy period. If Allstate had

---

**8.** This definition is used in the 1977–1980 policies. The definition used in the 1980– 1982 policies is essentially the same.

wished to ensure that it would have no obligation to indemnify for property damage that takes place outside of a policy period, it could have stated so in its policies. *See Monsanto Co. v. C.E. Heath Compensation and Liab. Ins. Co.*, 652 A.2d 30, 34–35 (Del.1995) (interpreting similar policy language and determining that a pro rata allocation of damages was inappropriate because the policy required the insurance company to pay "all sums" for which the insured was liable), *reargument denied.*

■ Allstate contends that in Indiana an injury-in-fact trigger is applied to determine whether an occurrence took place within a given policy period, and that liability for "all sums" is inconsistent with an injury-in-fact trigger.[9] We disagree. If several policies are triggered by continuous exposure to conditions, such as ongoing environmental contamination, we do not see how requiring an insurer to indemnify an insured for "all sums" pursuant to the terms of those policies is inconsistent with a determination that coverage is triggered when the damage occurs.

We conclude that the trial court erred when it denied Dana's motion for reconsid-

eration because the language of the policies mandates that if a policy is triggered by an occurrence that causes property damage, Allstate must indemnify Dana for all of the liability caused by the occurrence up to the limits of the triggered policy. Consequently, we reverse the judgment of the trial court on this issue and remand with instructions to enter partial summary judgment in Dana's favor.[10]

### III.

■ The third issue raised by Dana is whether the trial court erred when it determined that Dana is judicially estopped from arguing that its insurance policies with Hartford contain aggregate limits of liability on property damage. Dana claims that the trial court erred because, although Dana originally argued that Hartford's policies had aggregate limits on property damage, Dana did not prevail before the trial court with that argument. In response, Allstate contends Dana gained a benefit from originally arguing that there were no aggregate limits because Dana was subsequently permitted by the trial court to conduct discovery concerning how Hartford's policies were rated.[11]

---

9. The term "trigger of coverage" is not used in any of the policies at issue. The California Supreme Court has described the term as follows:

> In the third party liability insurance context, 'trigger of coverage' has been used by insureds and insurers alike to denote the circumstances that activate the insurer's defense and indemnity obligations under the policy. The term 'trigger of coverage' should not be misunderstood as a doctrine to be automatically invoked by a court to conclusively establish coverage in certain categories of cases, or under certain types of policies. The word 'trigger' is not found in the CGL policies themselves.... Instead, 'trigger of coverage' is a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the potential of coverage to arise. The issue is largely one of timing—what must take place within the policy's effective dates for the potential of coverage to be 'triggered?'

*Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 880 n. 2 (1995). We discuss below the question of what type of "trigger of coverage" is required by Allstate's policies. *See infra* Part VI.

10. As we discussed above, we decline to resolve the parties' dispute as to whether Allstate is entitled to a contribution from Dana for settlement payments that Dana has received from the other insurers because that issue is not ripe for adjudication.

11. Allstate also asserts that Hartford has adopted conflicting positions on the aggregate limits issue during the course of this litigation. However, Allstate did not argue to the trial court that Hartford was judicially estopped from submitting arguments on the aggregates issue, and the trial court did not discuss whether its judicial estoppel ruling applies to Hartford. Thus, to the extent that Allstate is claiming that Hartford is judicially estopped from discussing the aggregates is-

Judicial estoppel prevents a party from assuming a position in a legal proceeding inconsistent with one previously asserted. *Shewmaker v. Etter*, 644 N.E.2d 922, 931 (Ind.Ct.App.1994), *adopted sub nom. Hammes v. Brumley*, 659 N.E.2d 1021 (Ind.1995), *reh'g denied.* "Unlike equitable estoppel, which focuses on the relationship between the parties, judicial estoppel focuses on the relationship between a litigant and the judicial system." *Wabash Grain, Inc. v. Smith*, 700 N.E.2d 234, 237–238 (Ind.Ct.App.1998) (quoting 31 C.J.S. Estoppel and Waiver § 139 (1996)), *reh'g denied, trans. denied*, 714 N.E.2d 173. The purpose of judicial estoppel is to protect the integrity of the judicial process rather than to protect litigants from allegedly improper conduct by their adversaries. *Id.* at 238. In order for judicial estoppel to apply, "there must have been a determination of the prior action, or, at least, the allegations or admissions must have been acted on by the court in which the pleadings were filed or by the parties claiming the estoppel." *Id.* at 237 (quoting *Tobin v. McClellan*, 225 Ind. 335, 347, 73 N.E.2d 679, 684 (Ind. 1947), *reh'g denied*, 225 Ind. 335, 75 N.E.2d 149, *abrogated in part on other grounds by Sullivan v. American Cas. Co.*, 605 N.E.2d 134 (Ind.1992)). An essential part of the doctrine is that it prohibits a party from presenting a position contrary to one upon which it previously prevailed. *See* 31 C.J.S. *Estoppel and Waiver* § 139(b) (1996).

In the instant case, Dana filed a motion for partial summary judgment on September 25, 1995, arguing in part that the

policies of one of its underlying insurers, Fireman's Fund Insurance Company ("Fireman's Fund"), imposed no aggregate limits on Dana's claims for indemnification. Record, pp. 3066–3067 ("Dana's environmental liabilities do not fall within any of the three [contractual] categories identified ... for aggregate limits and therefore no aggregate limit applies."). The trial court denied Dana's motion for partial summary judgment against Fireman's Fund on the aggregates issue on September 10, 1996.

Thereafter, when Allstate filed its motion for partial summary judgment as to whether Hartford's underlying insurance policies, which are similar to Fireman's Fund's policies, contained aggregate limits of liability, Dana changed its position and argued that Hartford's policies did contain aggregate limits.[12]

Here, although Dana's present contention concerning aggregate limits is contrary to its prior contention, it gained nothing from the prior contention. Rather, it lost its motion for partial summary judgment based upon its claim that there was no aggregate limit in the Hartford policy. Its position here, while inconsistent with its prior position, is not inconsistent with the ruling made by the trial court. Thus, there is no concern that Dana might twice succeed in this case on each of two inconsistent and contrary claims. Because Dana gained no benefit from its previous position that there are aggregate limits in the Hartford policies, we conclude that the trial court erred when it determined that Dana was judicial-

sue, that claim is waived. *See Otto*, 612 N.E.2d at 135.

12. The reason for this change in position is easily understood. At the time that Dana filed its partial summary judgment motion against Fireman's Fund, Dana was seeking indemnification primarily from its underlying insurers and therefore sought to maximize its coverage on its underlying insurance policies. To that end, Dana argued that the underlying policies contained no aggregate limits upon the amounts for which Fireman's Fund would

be required to indemnify Dana. However, by the time that Allstate filed its partial summary judgment motion on the aggregates issue on January 19, 1999, Dana had settled with all of its primary insurance carriers and was seeking indemnification from its excess carriers, including Allstate. Therefore, Dana changed course, and it now seeks to minimize its coverage on its underlying insurance policies so that the excess insurance coverage will provide more indemnification.

ly estopped from arguing that there are aggregate limits in the Hartford policies. *See Meridian Insurance Co. v. Zepeda*, 734 N.E.2d 1126, 1133 (Ind.Ct.App.2000), *trans. pending; see also Shewmaker*, 644 N.E.2d at 931. Consequently, we shall address the merits of Dana's arguments on the aggregates issue.

## IV.

■ The fourth issue raised by Dana is whether the trial court erred when it granted Allstate's motion for partial summary judgment on the question of whether Hartford's policies contain aggregate limits of liability for property damage. Dana argues that it is necessary to consider extrinsic evidence to determine the parties' understanding of certain terms in the contract and that the extrinsic evidence creates a dispute of fact as to whether Hartford's policies impose aggregate limits.[13] Allstate replies that the language in Hartford's policies is unambiguous and demonstrates that the policies do not impose aggregate limits upon Hartford's coverage for Dana's property damage liabilities.

The significance of the aggregate limit issue is that where there is an applicable aggregate limit, that limit will define the maximum liability of the insurer where there are multiple occurrences, each of which creates liability for the insurer, subject to the per occurrence limits of the policy. For example, a policy with a per occurrence limit of $1,000,000 could provide liability for the insurer in the amount of $10,000,000 if there were ten occurrences, each creating liability for $1,000,-000. However, if the policy contained an aggregate limit (a limit of total liability) of $1,000,000, the insurer's limit would be $1,000,000 no matter how may occurrences there were.

Here, if the Hartford policies contain an aggregate limit applicable to the Dana claims, that would limit the total liability of Hartford to that aggregate limit, even though there might be an occurrence at each of multiple sites which would otherwise impose liability for the claims at each site up to the per occurrence limit. If the Hartford policies provide coverage subject only to per occurrence limits without an aggregate limit, that coverage for each site is underlying insurance to the Allstate excess coverage for each site. If the Hartford policies contain an aggregate limit, the underlying insurance to the Allstate excess coverage is that aggregate limit.

The parties agree that only the four Hartford policies that provided coverage to Dana from 1978 to 1982 are at issue. The parties also agree that Hartford's policies each impose a $1,000,000 aggregate limit on personal injury. Consequently, we will focus upon the Hartford policy language that addresses property damage.

The four Hartford policies provide, in relevant part: "The insurance afforded is only with respect to such of the following coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage shall be as stated herein, subject to all the terms of this policy having reference thereto."[14] Record, pp. 4287, 4289,

---

**13.** Dana also argues that if we affirm the trial court's decision that the personal injury coverage in Allstate's policies provides coverage for Dana's environmental liabilities, then this issue is moot because Dana will seek indemnification under the personal injury provisions of Allstate's policies. Regardless of our ruling on the personal injury issue, this issue is not moot because the extent of Allstate's duty to indemnify Dana's personal injury liabilities is dependent on a number of variables, including the coverage limits of underlying policies. *See infra* Part VI. Consequently, because Allstate's duty to indemnify Dana's per-

sonal injury losses is merely hypothetical at this point, the issue of aggregate limits is not rendered moot.

**14.** For one of the Hartford policies, the 1980–1981 policy, the parties have only provided us with the declarations page rather than the coverage page that is provided in the other three policies. Because the other three policies are identical, and neither party indicates that the 1980–1981 coverage page is different from those found in the other three policies, we will assume that the 1980–1981 coverage

4299. Next, each of the policies states that there is a $1,000,000 aggregate limit and a $1,000,000 per occurrence limit for property damage liability.[15] In addition, in a section of the policies entitled "Limits of Liability," each of the policies provides, in relevant part:

> Subject to the above provision respecting 'each occurrence', [sic] the total liability of the company for all damages because of all *property damage* to which this coverage applies and described in any of the numbered subparagraphs below shall not exceed the limit of *property damage* liability stated in the schedule as 'aggregate':
>
> (1) all *property damage* arising out of premises or operations rated on a remuneration basis....

Record, pp. 4288, 4291, 4300 (emphasis in original).[16]

Dana asserts that the phrase "operations rated on a remuneration basis" is a technical term that can only be understood by referring to extrinsic evidence, therefore rendering summary judgment inappropriate. We disagree. The Hartford policies define "remuneration," in relevant part, as follows:

> When used as a premium basis for:
>
> * * * * *
>
> (d) Comprehensive General Liability Insurance; Manufacturers' and Contractors' Liability Insurance or Owners', Landlords' and Tenants' Liability Insurance which includes coverage for structural alterations, new construction and demolition operations, 'remuneration' means the entire remuneration earned during the policy period by proprietors and by all employees of the *named insured*, ... subject to any overtime earn-

ings or limitation of remuneration rule applicable in accordance with the manuals in use by the Company; ....

Record, pp. 3226, 3232, 3236 (original emphasis).

Given this contractual definition of "remuneration," the definition of the phrase "operations rated on a remunerations basis" becomes clear: a business's facilities or activities whose policies are rated according to the compensation paid to the insured's owners and employees. Consequently, the phrase is not ambiguous and we may not consider extrinsic evidence to redefine the phrase. *See Eckart v. Davis,* 631 N.E.2d 494, 497 (Ind.Ct.App.1994) ("Where the terms of a contract are clear and unambiguous, they are conclusive and we will not construe the contract or consider extrinsic evidence but merely apply the contractual provisions."). Thus, Dana's argument on this point is without merit, and the cases cited by Dana on this point are inapposite.

■ Next, we must determine whether the four policies clearly provide that they were rated on a remunerations basis, in which case an aggregate limit would apply to Dana's claims for property damage, or whether the policies were rated on some other basis, in which case no aggregate limit applies. The Hartford policy that provided primary CGL coverage from 1978 to 1979 contains the following notation on its coverage page:

> COMPOSITE RATED
> GENERAL LIABILITY
> EXCLUDING PRODUCTS/CO
> PER 1,000 OF SALES

Record, p. 4287. The policy then projects that Dana will have $2,000,000 in sales and uses that amount to calculate "advance

---

page is identical to those found in the other three policies.

**15.** Neither party addresses the viability or the applicability of the per occurrence limit in the Hartford policies to Dana's losses.

**16.** The policies contain two other subparagraphs under which aggregate limits could be applied to Hartford's property damage liability. Nevertheless, both of the parties agree that neither of those subparagraphs are at issue and focus upon the "operations rated on a remuneration basis" policy language.

premiums." Record, p. 4287. The premiums are listed under the bodily injury category, but the property damage category contains the notation "INCL IN COMPOSITE RATE." Record, p. 4287. The other Hartford policies also calculate composite rate premiums from estimated sales figures for Dana. Record, pp. 4289, 4299. All of the declaration pages for the policies list a number of possible bases for calculating premiums, including remuneration and sales. However, the policies do not list the final premiums next to the "remuneration" category and instead use the sales rate of "Per $1,000 of Sales" to calculate premiums. Record, pp. 4287, 4289, 4299.

Dana asserts that the policies are ambiguous as to how they were rated and that further proceedings before the trial court are necessary.[17] We disagree. If the policies had used a remuneration basis to calculate premiums, as Dana asserts, then the premiums listed on the coverage pages of the policies would have been calculated according to the rates set forth in the "Remuneration" premium basis category. Record, pp. 4287, 4289, 4299. Instead, the advance premiums were calculated according to rates that were set forth in the "Sales" basis category and used

Dana's estimated sales to arrive at the premium amount. Record, pp. 4287, 4289, 4299. Consequently, the unambiguous language of the policies provides that Dana's premiums were calculated on a sales basis rather than on a remuneration basis.[18]

 Dana argues that the "relevant inquiry [for the aggregates issue] is the intention of Dana and Allstate as to inception under the *Allstate policies.*" Dana's Reply Brief, p. 26 (original emphasis). This is incorrect. When interpreting a contract, we look to the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. *See Rieth–Riley Constr. Co. v. Auto–Owners Mut. Ins. Co.,* 408 N.E.2d 640, 645 (Ind.Ct.App.1980). Therefore, we are concerned only with the intent of Dana and Hartford, who are the parties to the contracts at issue, and the unambiguous language of the contract demonstrates that the parties intended to rate Dana's premiums on a sales basis.[19]

We conclude that the trial court did not err in determining that the Hartford policies were unambiguous and that the policies were rated on a sales basis rather than a remuneration basis. Therefore,

17. Dana also asserts that the term "composite operations rated" is simply a way of describing the insured's total premium for auditing and adjustment purposes and does not denote an actual method for calculating premiums. We agree. As the declaration pages of Hartford's policies demonstrate, the "composite rate" is a figure that combines the advance premiums for bodily injury coverages and property damage coverages and does not describe how those advance premiums were calculated. Record, pp. 4287, 4289, 4299.

18. For the purposes of calculating premiums, "sales" is a defined term in Hartford's policies and is distinguishable from the definition of "remuneration," as follows:

When used as a premium basis for:
* * * * *
(e) Comprehensive General Liability Insurance or Completed Operations and Products Liability Insurance, 'sales' means the gross amount of money charged by the *named insured* or by others trading under

his name for all goods and products sold or distributed during the policy period for installation, servicing or repair, . . . .
Record, pp. 3226–3227, 3232–3233, 3236, 3238 (original emphasis).

19. Because the terms of the contract are unambiguous, we cannot examine the extrinsic evidence that the parties cite. *See Peoples Bank & Trust Co. v. Price,* 714 N.E.2d 712, 716 (Ind.Ct.App.1999) ("If the language of the instrument is unambiguous, the intent of the parties is determined from the four corners of that instrument."), *trans. denied,* 726 N.E.2d 313. In addition, we decline to discuss the *Intel, GAF,* and *Occidental* cases that the parties cite because they are unpublished decisions and have minimal persuasive authority. *See Intel Corp. v. The Hartford Accident & Indem. Co.,* No. C–87–20434 (N.D.Cal. Aug. 31, 1993); *GAF Corp. v. Hartford Accident & Indem.,* No. L–980–97 (N.J.Super.Ct. Law Div. July 1, 1999); *Occidental Chemical Corp. v. Hartford Accident & Indem. Co.,* No. 41009/80 (N.Y.Sup.Ct. Dec. 4, 1996).

there are no aggregate limits on Dana's coverage for property damage under the Hartford contracts. Allstate was entitled to partial summary judgment as a matter of law, and we affirm the judgment of the trial court on this issue.

### V.

The first issue raised by Allstate is whether the trial court erred when it granted Dana's motion for partial summary judgment on the question of whether the personal injury provisions of Allstate's policies provide coverage for cleanup costs such as those imposed upon Dana. Allstate asserts that the trial court overlooked the specific language in some of its policies that excludes such coverage. Dana responds that Allstate has waived its challenge to the trial court's judgment, and, in the alternative, that the trial court's judgment is consistent with existing precedent.[20]

### A.

■ We address Dana's waiver argument first. Dana alleges that Allstate did not address the merits of Dana's motion for partial summary judgment on this issue before the trial court, choosing instead to argue that Dana had a duty to specifically "present" its personal injury claims to its insurers and had failed to do so in a proper manner. Dana's Appellee's Brief, pp. 38–39. Dana concludes that because Allstate did not address the merits of its motion at the proper time, Allstate may not challenge the trial court's ruling on the merits now.

■ A party cannot change its theory and on appeal argue an issue that was not properly presented to the trial court. *Franklin Bank & Trust Co. v. Mithoefer,* 563 N.E.2d 551, 553 (Ind.1990). In the instant case, although Allstate devoted much of its trial court brief to its claim that Dana was required to identify the type of coverage under which it was seeking indemnification and had failed to do so, Allstate did discuss Dana's claims for personal injury coverage in the context of the applicability of a pollution exclusion clause in its policies.[21] Thus, Allstate directly addressed Dana's personal injury claims before the trial court and did not confine its arguments to one theory. Consequently, Allstate has preserved this issue for appellate review, and we will address its arguments on the merits. *See Powell v. American Health Fitness Ctr.,* 694 N.E.2d 757, 760 (Ind.Ct.App.1998) (determining that the appellant had not waived an issue where the appellant had made related arguments before the trial court and on appeal).

### B.

Allstate argues that the language of several of its policies bars indemnification of the pollution-based personal injury claims at issue here. Consequently, we begin with the policies' definition of personal injury. The three policies that provided coverage from 1977 to 1980 provide, in relevant part, that "personal injury" includes:

> bodily injury (including death at any time resulting therefrom), mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation; also libel, slander or defamation

**20.** Both parties appear to be under the impression that the trial court's ruling on the personal injury issue only applies to the five sites that had been discussed in the parties' briefs to the trial court on this issue. However, the trial court's decision focused upon interpreting the policies at issue, not the facts of the five sites, and so it appears that the trial court intended for its ruling to apply to all of the sites in dispute, not just the five that had been set for trial at that time. Consequently, our review of this issue is also not confined to the five sites discussed by the parties.

**21.** Allstate is not appealing the trial court's determination that Dana was not contractually required to identify the type of coverage under which it was seeking indemnification.

of character or invasion of rights of privacy, . . . .

Record, pp. 6489, 6523, 6542. The two policies that provided coverage from 1980 to 1982 define personal injury as:

(1) bodily injury, sickness, disease, disability or shock, including death at any time resulting therefrom, mental anguish and mental injury;

(2) false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention or malicious prosecution,

(3) libel, slander, defamation of character, humiliation or invasion of the rights of privacy, unless arising out of advertising activities, which occurs during the policy period.

Record, pp. 6597, 6629.

After examining the policy language, the trial court determined that the personal injury provisions of "wrongful entry," "wrongful eviction," and "invasion of rights of privacy" are ambiguous and must be construed in favor of coverage. In doing so, the trial court referred to our opinion in *Summit. Travelers Indem. Co. v. Summit Corp.*, 715 N.E.2d 926 (Ind.Ct.App. 1999). In *Summit,* we determined that the use of the terms "wrongful entry" and "invasion of the right of private occupancy" were ambiguous and that policies using those terms in describing "personal injury" coverage would be construed to provide personal injury coverage for "pollution of real property of others by Summit in sending wastes to real property of others and allowing contaminated groundwater to migrate from its sites to neighboring land." *Id.* at 937. Although the term "wrongful eviction" was also used in those policies, we did not focus upon its use as we did on "wrongful," "entry," and "invasion." In this case, we must give attention to "wrongful eviction" because "wrongful entry" is not used in some of the policies.

Here, Allstate is not challenging the trial court's determination that the phrase "wrongful entry" triggers personal injury

coverage for losses arising from environmental contamination. Consequently, Allstate must concede that its 1980–1981 and 1981–1982 policies, which contain the "wrongful entry" language, provide personal injury coverage for Dana's environmental liabilities. Instead, Allstate argues that its three policies with Dana that were in effect from 1977–1980 only cover "invasion of rights of privacy" and "wrongful eviction," and that neither of those terms can be construed to apply to Dana's environmental liabilities.

■■■ Turning first to "invasion of rights of privacy," the policies here use the term "invasion of [the] rights of privacy" rather than the term "invasion of the right of private occupancy" used in the policies under consideration in *Summit.* In that case, we found that the latter term was ambiguous and provided coverage under "personal injury" coverage. *See Summit,* 715 N.E.2d at 937. The term used in these policies is even broader and would be construed to include in the term "rights of privacy" the term "right of private occupancy." *See Doe v. Methodist Hosp.,* 690 N.E.2d 681, 684 (Ind.1997) (noting that the tort of "invasion of privacy" encompasses four different torts). Consequently, the term "invasion of rights of privacy" is ambiguous, and we will construe it against the insurer, Allstate, to provide coverage for Dana's liability for environmental damages. *See Dana I,* 690 N.E.2d at 295.

Allstate contends that the term "invasion of rights of privacy" cannot be construed to provide coverage for pollution damage to property because the term is found in the policies grouped with torts against one's reputation, including slander, rather than with torts against one's enjoyment of one's property, such as wrongful eviction. We disagree. The fact that the different types of torts that give rise to personal injury are separated into different clauses is not dispositive and does not eliminate the ambiguity in the terms at issue. *See Delaplane v. Francis,* 636 N.E.2d 169, 172 (Ind.Ct.App.1994) (deter-

mining that an insurance policy was not rendered unambiguous because a "reduction clause" was placed within a certain section of the contract), *trans. denied.*

In keeping with *Summit,* we note that Dana is not entitled to indemnification for invasions of its own privacy. Instead, Dana may only seek personal injury coverage for liabilities at sites due to invasions of rights of privacy where Dana has "sen[t] wastes to real property of others and allow[ed] contaminated groundwater to migrate from its sites to neighboring land." *Summit,* 715 N.E.2d at 926.

Turning to the phrase "wrongful eviction," "eviction" is not defined in the policies, but the word "evict" is defined elsewhere as "to recover (property) through court judgment or superior claim . . . to remove (a tenant) from leased premises by legal procedure, as for failure to pay rent. . . ." WEBSTER'S NEW WORLD DICTIONARY 471 (3d College ed.1988). The concept of eviction depends upon a relationship between the evictor and evictee of landlord and tenant. It also requires a dispossession of property. *See, e.g., Zalud v. Ethan Assoc.,* 418 N.E.2d 309, 312 (Ind. Ct.App.1981) (noting that, "[t]o constitute an eviction, the act of the *lessor* must be an actual eviction or an interference with *possession* so serious that it deprives the *lessee* of the beneficial enjoyment of the leased premises, i.e., a constructive eviction" (emphasis added)). Conceding some ambiguity to the use of the term in the context of claims for environmental cleanup costs, we cannot say that "personal injury" coverage for "wrongful eviction" would extend to such costs except where a tenant of Dana was compelled to vacate a location because of environmental damage. There are no such claims here and, therefore, no coverage for "wrongful eviction."

In sum, we hold with respect to personal injury coverage that there is coverage in those circumstances where Dana was liable for cleanup costs for the real property of others to which Dana had sent wastes or to which contaminated groundwater migrated from Dana's property. *See Summit,* 715 N.E.2d at 940. Consequently, we affirm the trial court's grant of partial summary judgment on this issue.

## VI.

The second issue raised by Allstate is whether the trial court erred when it granted Dana's motion for summary judgment as to Allstate's liability for environmental cleanup costs imposed on Dana at Old Forge. Allstate contends that the trial court erred when it determined that only one, rather than two, of its policies had been triggered by the pollution at Old Forge. Allstate also argues that the trial court erred when it determined that its policies "attached," or began to provide coverage, for Dana's losses at Old Forge because Dana did not obtain full indemnification from its primary insurers before seeking coverage from Allstate.

A review of the facts relating to Old Forge is helpful. Old Forge is located in Pennsylvania and consists of five former strip mine pits that were converted into landfills. None of the pits were lined to prevent leakage of pollutants into the environment, and there was no leachate collection system at the site during the times relevant to this appeal. An unconfined aquifer lies beneath the pits and flows into a nearby river.

In 1978, a Dana-owned facility in Pennsylvania contracted with Simon's Wrecking, Inc. ("Simon"), to dispose of waste oil generated at the facility. From August through December of 1978, Simon transported 1,409 drums of Dana's used oil to Old Forge. In early 1979, people living near Old Forge complained to the Pennsylvania Department of Environmental Resources ("PADER") about the disposal of hazardous wastes at Old Forge. In March 1979, PADER closed the landfill.

Subsequent investigations revealed that most of the drums that were buried in the pits had broken open and that toxic chemicals had been released into the soil. The

parties agree that it is likely that pollutants from the drums had seeped into the groundwater by the beginning of 1979 at the latest. Furthermore, the toxic waste continued to cause environmental damage at Old Forge through the 1980s.

In 1989, PADER and the United States Environmental Protection Agency ("the EPA") filed suit against Dana and other companies that had dumped toxic wastes at Old Forge in order to recover costs incurred in the course of cleaning up the site. The parties settled the dispute, and Dana paid $3,004,420 to PADER and the EPA.

### A.

We address the trigger of coverage issue first because if we determine that a given Allstate policy was not triggered, then the question of whether Dana failed to obtain the maximum amount of indemnification from its underlying insurers for that policy year is moot. The parties stipulated to the trial court that one of Allstate's umbrella polices, the 1978–1979 policy, was triggered by Dana's claims for indemnification. The parties also stipulated that the damage at Old Forge was "properly described as both personal injury and property damage losses," thereby triggering both types of coverage under the policy. Record, p. 6826. However, Allstate contended that the 1979–1980 policy was also triggered by Dana's liabilities, while Dana asserted that only the 1978–1979 policy was triggered. The trial court agreed with Dana.

Allstate argues that the trial court's decision was erroneous because it had presented evidence to the trial court that Dana's contaminants had continued to cause personal injury damage and property damage at Old Forge after the 1978–1979 policy year had expired, thereby triggering coverage under the 1979–1980 policy as well as the 1978–1979 policy. Dana responds that only one policy could have been triggered because the contamination at Old Forge was but one occurrence un-

der the 1978–1979 policy, thereby precluding coverage under the 1979–1980 policy.

■ Before we deal with the issue of which policies were triggered, we must address Allstate's claim that Dana failed to raise the "one occurrence" argument before the trial court and has waived this issue for appellate review. Generally, a party may not raise an issue on appeal that was not raised in the trial court. *Ansert ex rel. Ansert v. Indiana Farmers Mut. Ins. Co.*, 659 N.E.2d 614, 617 (Ind.Ct. App.1995), *reh'g denied, trans. dismissed.* This rule also applies to summary judgment proceedings. *Id.* However, where an opposing party has unequivocal notice of an issue, that issue may be considered on appeal. *Id.*

In this case, both before the trial court and on appeal, Dana has consistently argued that the contaminants at Old Forge caused property damage and personal injury that was covered by the 1978–1979 policy alone. Therefore, Allstate's assertion that Dana is attempting to present a new theory on appeal is incorrect. Furthermore, Allstate itself asserts that the property damage at Old Forge was the result of an ongoing process that began in the 1978–1979 policy year and continued into the following years. Consequently, Allstate had unequivocal notice of Dana's contention that there was only one occurrence, and we will address Dana's contention on the merits. *See id.*

Both the 1978–1979 and 1979–1980 policies provide, in relevant part:

> 'Occurrence' means an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in Personal Injury [or] Property Damage ... neither expected nor intended from the standpoint of the Insured.... All such Personal Injury [or] Property Damage ... caused by one event or by continuous or repeated exposure to substantial-

ly the same conditions shall be deemed to result from one Occurrence.

Record, pp. 6530, 6543.

Here, Allstate's expert on the pollution at Old Forge, John A. Rhodes, testified in a deposition, "I believe the RI [22] observed the leachate seeps and sampled them in the early '80s, so perhaps the environmental damage in the '80s and really throughout up until the RI is going to be similar, . . . ." Record, p. 8761. When asked to describe the environmental damage at Old Forge in 1979, Mr. Rhodes stated, "I don't think I draw a distinction between the years. Presumably there's been additional materials added to the site, but I think the observations of environmental damage or potential damage would be similar, and conditions underground would be similar." Record, p. 8760. Consequently, because the policies identify ongoing exposure to the same conditions as one occurrence, and because undisputed evidence demonstrates that the property damage and personal injury caused by Dana at Old Forge resulted from one continuous episode of pollution, the resulting contamination must be considered one occurrence according to the unambiguous language of the 1978–1979 policy.

■ Although we agree with Dana that the ongoing pollution at Old Forge was one occurrence under the 1978–1979 policy, we do not agree that that necessarily precludes the 1979–1980 policy from being triggered as well. What the policies require to trigger indemnification is an occurrence "during the policy period." Record, pp. 6541–6542. Continuous or repeated exposure to conditions that results in property damage during a policy period is a single occurrence for the purposes of that policy. If those conditions persist into the period covered by a subsequent policy, there is no language to preclude there being an occurrence for the purposes of the subsequent policy. Thus, ongoing

exposure to conditions of pollution can constitute an occurrence for each consecutive policy, and Dana's contention is without merit.

■ Before we can ascertain whether the coverage under Allstate's 1979–1980 policy was triggered, we must determine what type of triggering approach should be applied to the instant facts. Other jurisdictions have applied a variety of triggering standards. As one court has noted:

If coverage is triggered at the time that personal injury or property damage becomes known to the victim or property owner, the approach is identified as the 'manifestation theory.' If coverage is triggered when real personal injury or actual property damage first occurs, the approach is called the 'injury in fact theory.' If coverage is triggered when the first exposure to injury-causing conditions occurs, then the court is said to have chosen the 'exposure theory.' Finally, if coverage is triggered in a manner such that insurance policies in effect during different time periods all impose a duty to indemnify, then the approach is labelled a 'continuous' or 'multiple' trigger theory.

*Dow Chem. Co. v. Associated Indem. Corp.*, 724 F.Supp. 474, 478 (E.D.Mich. 1989). We note, however, that we are not "choosing" a triggering approach here. Rather, because the issue presented here is a question of contract interpretation, we focus upon the language of the policy to determine what approach the parties have chosen.

The 1979–1980 policy provides that an occurrence is an "event, accident, or happening[,] including continuous or repeated exposure to conditions[,]" that results in property damage or personal injury, and that such damage or injury must occur "during the policy period." Record, pp. 6530, 6543. Stated another way, the poli-

---

**22.** "RI" appears to be an abbreviation for "remedial investigation." Record, pp. 8760– 8761.

cy's plain language requires that an actual injury must occur during the time the policy is in effect in order to trigger property damage coverage. Therefore, pursuant to the policy language, we must adopt an injury-in-fact triggering approach as we determine whether personal injury and property damage coverage was triggered during the policy year. *See Gelman Sciences, Inc. v. Fidelity & Cas. Co.*, 456 Mich. 305, 572 N.W.2d 617, 623, 627–628 (1998) (examining the plain language of a policy with language similar to the policies at issue and determining that an injury must occur while a policy is in effect in order for the injury to be subject to indemnity under that policy), *amended sub nom. Arco Indus. Corp. v. American Motorists Ins. Co.*, 456 Mich. 1230, 576 N.W.2d 168 (1998). Therefore, we must determine whether the undisputed material facts demonstrate that there was no "accident, event or happening" to trigger personal injury and property damage coverage under the 1979–1980 policy.

 We address the personal injury coverage first. The 1979–1980 policy defines "personal injury" as:

> bodily injury (including death at any time resulting therefrom), mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation; also libel, slander or defamation of character or invasion of rights of privacy, . . . which results in an Occurrence during the policy period.

Record, p. 6542. The trial court found that the personal injury liability for damages that occurred at Old Forge during the 1978–1979 policy year was due to a wrongful eviction, and that coverage was not triggered during the 1979–1980 policy year because the wrongful eviction took place wholly in the 1978–1979 policy year. We agree with the trial court's conclusion that there was no wrongful eviction during the 1979–1980 policy year, but we reach that conclusion for different reasons. As

we discussed above, the tort of wrongful eviction only arises in the context of a landlord-tenant relationship and requires a dispossession of property. *See supra* Part V. In this case, the stipulated facts reveal only that Dana, through Simon, dumped its waste at Old Forge. There is no evidence that Dana was in any sense a landlord or tenant at Old Forge. Consequently, a wrongful eviction cannot have taken place at Old Forge during the 1979–1980 policy year.

 Our analysis does not end there, however. We have determined that the phrase "invasion of rights of privacy" as used in Allstate's policies is ambiguous and must be construed in favor of coverage where Dana is liable for cleanup costs for the real property of others to which Dana had sent wastes or to which contaminated groundwater migrated from Dana's property. *See supra* Part V (citing *Summit*, 715 N.E.2d at 940). In the instant case, the parties agree that Old Forge was closed by PADER in March 1979 and that Dana's share of the waste chemicals at the site came from drums that had been dumped at Old Forge during the 1978–1979 policy year. Allstate's expert on the pollution at Old Forge, John A. Rhodes, testified that the contaminants most likely seeped into the groundwater during the 1978–1979 policy year and continued to do so in the 1979–1980 policy year. Thus, the contamination of the site and of the groundwater occurred in both the 1978–1979 and the 1979–1980 policy years. Pursuant to the language of the policy, there was a "continuous or repeated exposure" to the same condition in each policy year, thereby resulting in an occurrence in each policy year. Consequently, the personal injury coverage of the 1979–1980 policy was also triggered.

Dana asserts that applying the injury-in-fact trigger to the facts of this case inescapably leads to a conclusion that only the 1978–1979 policy was triggered because the injury was complete when the pollutants first reached the groundwater during

the 1978–1979 policy year. We disagree. As we have discussed above, the policies do not preclude continuing exposure to conditions from being an occurrence for the purposes of more than one policy period. *See supra* Part II. At Old Forge, the evidence demonstrates that the contamination occurred continuously through several policy periods. Consequently, we reverse the trial court's determination that the personal injury coverage of the 1979–1980 policy was not triggered by the pollution at Old Forge.

■ Turning to property damage coverage, the 1979–1980 policy defines property damage as "loss of or direct damage to or destruction of tangible property (other than property owned by any Insured) and which results in an Occurrence during the policy period." Record, p. 6542. The trial court found that the property damage at Old Forge occurred, for the purposes of triggering an occurrence, in the 1978–1979 policy year alone. Allstate argues that uncontested evidence demonstrates that the damage to the groundwater and neighboring property continued into the 1979–1980 policy year, thereby triggering coverage under that policy. We agree.

The testimony of Allstate's expert was that although Dana's chemicals seeped into the soil and the groundwater running beneath it during the 1978–1979 policy year, the chemicals continued to contaminate the soil and groundwater well into the 1980s, causing additional damage. The pollution was a continuous process that took place during each policy year, and so there was property damage during each policy year. As a result, the property damage coverage of Allstate's 1979–1980 policy was also triggered, and the trial court erred when it granted summary judgment to Dana on

this point. *See Gelman Sciences,* 572 N.W.2d at 627 (applying an injury-in-fact trigger and determining that several successive policies were triggered when pollution took place at a site over a number of years, thereby causing actual property damage under each policy).

### B.

■ Next, Allstate asserts that the plain language of its policies required Dana to exhaust both its underlying property damage coverage and its underlying personal injury coverage from Hartford before Allstate's excess policies would attach to Dana's liabilities.[23] Allstate also asserts that Dana has "$62 million worth of available [per occurrence] coverage in the primary policies" for property damage losses, and that the trial court erroneously shifted liability for that coverage to Allstate.[24] Allstate's Appellant's Brief, p. 19.

The two policies at issue provide, in relevant part:

I. COVERAGE

The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability

 A. imposed upon the Insured by law, or

 B. assumed under contract or agreement by the Named Insured, for damages on account of

 A. Personal Injuries

 B. Property Damage

\* \* \* \* \*

caused by or arising out of each Occurrence happening anywhere in the world.

---

**23.** Because we have determined that both the 1978–1979 and the 1979–1980 policies were triggered, we must determine whether both policies attached and provided coverage to Dana's losses, not just the 1978–1979 policy.

**24.** We have determined that the policies of Hartford, which was Dana's underlying CGL

insurer during the 1978–1979 and 1979–1980 policy years, do not contain aggregate limits of liability. *See supra* Part IV. Consequently, we will limit our discussion of underlying limits to the "per occurrence" limits in Hartford's policies.

## II. LIMIT OF LIABILITY

The Company shall only be liable for the Ultimate Net Loss in excess of either

A. the limits of the underlying insurances as set out in the attached SCHEDULE OF UNDERLYING POLICIES in respect of each Occurrence covered by said underlying insurances, or

B. the retained limit as stated in Declaration Item 2(c) if the Occurrence is not covered by said underlying insurances, (hereinafter called the underlying limits),

and then only up to a further sum as stated in item 2(a) of the Declarations in all respect of each Occurrence—subject to a limit as stated in Item 2(b) of the Declarations in the aggregate

A. for each annual period during the currency of this policy, but

B. separately in respect of Products Liability and in respect of Personal Injury (fatal or nonfatal) by occupational disease sustained by any employees of the insured.

Record, pp. 6528, 6541.

Both policies also assert, in relevant part, that "[l]iability under this policy with respect to any Occurrence shall not attach unless and until the Insured, or the Insured's underlying insurer, shall have paid the amount of the underlying limits on account of such Occurrence." Record, pp. 6534, 6547.

The policies contain a number of endorsements in which the parties agreed to amend specific portions of the standard policies. Endorsement number sixteen in the 1978–1979 policy and endorsement number seventeen in the 1979–1980 policies both provide schedules of underlying insurers and the limits of each insurers' coverage. Hartford is listed as Dana's underlying CGL insurer in both Allstate policies, and Hartford's policies are described as containing a per occurrence and

aggregate limit of liability of $1,000,000 for bodily injury (personal injury) and a per occurrence limit of liability of $1,000,000 for property damage.[25]

■ Allstate asserts that its policies provide that Dana must exhaust all available underlying coverage, including Hartford's $1 million per occurrence coverage for property damage and bodily injury, before Allstate's excess coverage attaches. Therefore, Allstate concludes that the trial court should have determined that Dana must exhaust Hartford's $1 million per occurrence property damage limit before the Allstate policies are required to provide coverage. We agree. The purpose of excess or umbrella insurance is to provide coverage when underlying insurance has reached its limits of indemnification. Both of the Allstate policies at issue provide in plain and unambiguous language that they will only provide coverage for damages in excess of "the limits of the underlying insurances ... in respect of each Occurrence" and that Allstate's duty to indemnify "with respect to any Occurrence" does not attach until the limits of the underlying policy have been reached "on account of such Occurrence." Record, pp. 6528, 6534, 6541, 6547. Consequently, Dana is not entitled to indemnification under Allstate's 1978–1979 and 1979–1980 policies unless the "per occurrence" limit (or any other applicable limit) of the applicable underlying policies has been reached.

Here, the trial court determined that Allstate's 1978–1979 policy attached to Dana's liabilities at Old Forge "regardless of the potential concurrent availability of property damage liability coverage with no aggregate limits" because Dana had personal injury liability in excess of the $1 million aggregate limit for personal injury in Hartford's 1978–1979 policy with respect to sites other than Old Forge. Record, p. 6834. We agree with the trial court that the 1978–1979 policy attached to

---

**25.** As we have previously determined, the aggregate limit for property damage liability expressed in the Hartford policy is not applicable to Dana's liabilities.

Dana's liability, but we hold that the trial court erred in concluding that Allstate's obligation to pay attached without regard to the limits for property damage. Allstate's obligation does not attach until the Hartford policy limits for both personal injury and property damage have been reached. The parties stipulated to the trial court that Dana then paid $3,004,420 in damages for the contamination at Old Forge. Furthermore, the parties also stipulated that Dana incurred in excess of $1 million dollars in "Ultimate Net Loss" during the 1978–1979 policy year for occurrences other than Old Forge, and, as noted above, that Dana's "Ultimate Net Loss" consisted of both personal injury and property damage losses. Record, pp. 6825, 6826. Hartford's underlying policy for the 1978–1979 policy year contains a $1 million per occurrence limit for property damage liability. The record is not clear as to whether there should be some allocation of the $1 million in liability for other than the Old Forge site between personal injury coverage and property damage coverage. If it were all for personal injury, the Hartford aggregate limit for personal injury coverage would have been reached and the $1 million Hartford per occurrence limit for property damage would have to be applied before Allstate's obligation to pay would attach. If only some of that $1 million liability for sites other than Old Forge was for personal injury coverage, there would remain for application against Allstate's obligation to pay at Old Forge the balance of the $1 million aggregate limit for personal injury liability plus the $1 million Hartford per occurrence limit. By way of illustration, if the $1 million for sites other than Old Forge was all for personal injury coverage, Allstate's obligation to pay would not attach until the $1 million property damage limit was met and it would be liable for $2,004,420 only and not for $3,004,420 as found by the trial court.

Turning to Allstate's 1979–1980 policy, the parties stipulated to the trial court that Dana had liability for damages in excess of $1 million for occurrences other than at Old Forge during the 1979–1980 policy year, and that those damages could properly be described as both personal injury and property damage liability. Hartford's underlying CGL policy for the 1979–1980 policy year contains an aggregate and per occurrence limit of $1 million for personal injury liability and a per occurrence limit of $1 million for property damage liability. Again, it is unclear what allocation, if any, should be made of the $1 million in liability for sites other than Old Forge between personal injury coverage and property damage coverage of the underlying Hartford policy. Our discussion in that regard as to the 1978–1979 policies would apply to the 1979–1980 policies as well.

Therefore, we reverse the trial court's determination that the personal injury and property damage coverages of Allstate's 1979–1980 policy were not triggered by Dana's liabilities. As a practical matter, Allstate's obligation to pay under the 1978–1979 policy will completely discharge its obligations with respect to the Old Forge claim.

 Because we have also decided above that the "all sums" language in the Allstate policies requires that Allstate pay for all sums up to its limits of liability for damages caused by an occurrence even though some of that damage continues to take place after the expiration of the policy period, the 1978–1979 Allstate policy would be liable up to its limit of $5,000,000 per occurrence and in the aggregate. Therefore, that policy would bear the liability for $2,004,420 of Dana's liabilities at Old Forge, which represents $3,004,420 in damages less the Hartford per occurrence limit of $1,000,000 for property damage.

## VII.

The third issue raised by Allstate is whether the trial court erred when it awarded prejudgment interest to Dana as part of the Old Forge summary judg-

ment.[26] The trial court granted Dana $1,594,894.30 in prejudgment interest. This amount was calculated at eight percent per annum of $3,004,420, starting from September 22, 1992, which was the date that Dana paid its share of Old Forge cleanup costs to PADER and the EPA, and ending on April 30, 1999. The trial court listed three grounds for the imposition of prejudgment interest: 1) that Dana was entitled to prejudgment interest according to case law; 2) that Dana was entitled to prejudgment interest according to Ind.Code § 24–4.6–1–103; and 3) that Dana was entitled to prejudgment interest according to Ind.Code § 24–4.6–1–102. Allstate challenges all of three of these grounds, and we will address each in turn.

■■ Because two of the points at issue here involve statutes, we briefly review our rules of statutory interpretation. Words and phrases shall be taken in their plain, or ordinary and usual, sense. Ind. Code § 1–1–4–1. Construction of a statute is only necessary when a statute is ambiguous. *George P. Todd Funeral Home, Inc. v. Estate of Beckner*, 663 N.E.2d 786, 787 (Ind.Ct.App.1996). A statute is ambiguous, and thus open to judicial construction, when it is susceptible to more than one meaning. *Hendricks County Bd. of Zoning Appeals v. Barlow*, 656 N.E.2d 481, 485 (Ind.Ct.App.1995).

### A.

■ Allstate first asserts that the trial court granted Dana an excessive amount of prejudgment interest according to case law. Specifically, Allstate contends that the amount of damages it owed to Dana could only have been established after the underlying insurers' policy limits were reached, and that the interest should be calculated from that point rather than from September 11, 1992. Dana responds

that Allstate confuses liability with damages, and that Dana's damages were established on September 11, 1992.

■ In Indiana, an award of prejudgment interest in a contract case in is warranted if the terms of the contract make the claim ascertainable and the amount of the claim rests upon mere computation. *J.S. Sweet Co. v. White County Bridge Comm'n*, 714 N.E.2d 219, 225 (Ind. Ct.App.1999). When the trier of fact determines that liability for damages exists, prejudgment interest is proper only where a simple mathematical computation is required; it is not proper when the court must determine the value of the liability. *Thomas J. Henderson, Inc. v. Leibowitz*, 490 N.E.2d 396, 400 (Ind.Ct.App.1986). An award of prejudgment interest is generally not considered a matter of discretion. *J.S. Sweet Co.*, 714 N.E.2d at 225.

In the instant case, Dana and Allstate stipulated to the trial court that Dana paid $3,004,420 in cleanup costs to PADER and the EPA on September 11, 1992. However, that stipulation merely establishes the amount of damages that Dana paid to government agencies, not the amount of damages for indemnification that Allstate owes to Dana for breach of its 1978–1979 and 1979–1980 insurance policies. As we have discussed, Allstate's duty to indemnify Dana only takes effect after Dana has exhausted the per occurrence limits in Hartford's primary policies. *See supra* Part VI. Thus, before Allstate could be held liable for prejudgment interest, the trial court had to determine whether Dana's liability exceeded Hartford's policy limits. In addition, the trial court had to resolve a number of disputes over the provisions of various policies, including whether Hartford's aggregate limit applied to Dana's liabilities and whether Allstate was required to pay for "all sums" of Dana's

---

**26.** Because we are reversing the trial court's grant of summary judgment on Old Forge, we need not address the award of prejudgment interest. However, we choose to consider this issue in order to provide guidance to the

trial court on remand. *See Irvine v. Irvine*, 685 N.E.2d 67, 71 (Ind.Ct.App.1997) (reviewing the trial court's award of prejudgment interest although it reversed the trial court's judgment).

liabilities, before it could ascertain the amount for which Allstate was required to indemnify Dana. Consequently, because Allstate's share of responsibility for clean-up costs at Old Forge was not readily ascertainable until these complicated issues were resolved, Dana is not entitled to prejudgment interest according to the case law. *See, e.g., Eden United v. Short,* 653 N.E.2d 126, 134 (Ind.Ct.App.1995) (determining that the trial court erred when it awarded prejudgment interest for lost profits because there was no fixed standard by which damages could be ascertained), *reh'g denied, trans. denied; Gibson–Lewis Corp. v. Northern Ind. Pub. Serv. Co.,* 524 N.E.2d 1316, 1319 (Ind.Ct. App.1988) (affirming the trial court's grant of only limited prejudgment interest where the amount of compensation upon which the appellant based its claim for additional prejudgment interest was not readily as-certainable), *reh'g denied, trans. denied.*

### B.

■ Allstate next argues that Ind. Code § 24–4.6–1–103 does not support an award of prejudgment interest in this case. That statute provides, in relevant part: "Interest at the rate of eight percent (8%) per annum shall be allowed ... from the date an itemized bill shall have been rendered and payment demanded on an account stated, account closed or for money had and received for the use of another and retained without his consent." I.C. § 24–4.6–1–103. An account stated has been defined as "an agreement between parties that all items of account and the balance struck are correct, together with a promise, express or implied, to pay the balance." *Leibowitz,* 490 N.E.2d at 399 (quoting *Urbanational Dev. v. Shamrock Eng'g,* 175 Ind.App. 416, 428, 372 N.E.2d 742, 750 (Ind.Ct.App.1978), *reh'g denied* ).

In this case, Dana is not entitled to prejudgment interest pursuant to Ind. Code § 24–4.6–1–103 because there was no agreement between Allstate and Dana that the "balance struck" by Dana was correct.

Although Dana paid $3,004,420 to PADER and the EPA on September 11, 1992, Allstate's duty to indemnify Dana only took effect if and when Dana's losses exceeded Hartford's policy limits. Consequently, a "balance," as applied to Allstate, could only be established after the underlying policies' per occurrence limits had been exhausted.

Furthermore, Allstate's policies and conduct over the course of this case do not demonstrate that it expressly or impliedly agreed to pay the "balance" of Dana's payments to PADER and the EPA. Allstate's policies may be construed as promises to pay the balance remaining after the limits of the underlying policies have been exhausted, but not a promise to pay the entire balance. Therefore, the trial court erred when it held that this statute authorized the imposition of prejudgment interest. *See, e.g., Eden United,* 653 N.E.2d at 134.

### C.

■ Allstate asserts that the trial court erred when it awarded prejudgment interest pursuant to Ind.Code § 24–4.6–1–102 because that statute does not authorize an independent right to prejudgment interest. Ind.Code § 24–4.6–1–102 provides, "[w]hen the parties do not agree on the rate, interest on loans or forbearances of money, goods or things in action shall be at the rate of eight percent (8%) per annum until payment of judgment."

We agree with Allstate that the statute, by itself, does not authorize a trial court to award prejudgment interest. The language of the statute is unambiguous, and it merely establishes a default interest rate for courts to use when the parties cannot agree on a proper rate. Previous opinions discussing Ind.Code § 24–4.6–1–102 have also treated it as a mere default interest rate provision rather than an independent basis for prejudgment interest. *See Gibson–Lewis,* 524 N.E.2d at 1319; *In re Estate of Kingseed,* 413 N.E.2d 917, 934–935 (Ind.Ct.App.1980), *reh'g denied.* There-

fore, this statute cannot, by itself, support the award of prejudgment interest, and the trial court erred when it cited this provision as an independent basis for such an award.

## VIII

In conclusion, we reverse the trial court's grant of partial summary judgment in favor of Allstate on the owned property issue, we reverse the trial court's denial of Dana's motion for partial summary judgment on the "all sums" issue, we affirm the trial court's grant of partial summary judgment in favor of Allstate on the aggregates issue, we affirm the trial court's grant of partial summary judgment in favor of Dana on the personal injury issue, we reverse the trial court's grant of summary judgment in favor of Dana on Old Forge, and we reverse the trial court's award of prejudgment interest to Dana. We remand to the trial court to: 1) enter partial summary judgment in favor of Dana on the owned property issue; 2) enter partial summary judgment in favor of Dana on the allocation issue; 3) redetermine the amount of Allstate's liability to Dana for Dana's liabilities at Old Forge in a manner consistent with this opinion.

Affirmed in part and reversed in part.

BAILEY and ROBB, JJ., concur.